UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION



SECURITIES AND EXCHANGE COMMISSION, )
)
)
Plaintiff, ) No. 02 C 2180
)
v. ) Hon. Wayne R. Andersen
)
JAMES E. KOENIG, ) Magistrate Judge
) Nan R. Nolan
Defendant. )
)

# SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST DEFENDANT KOENIG FOR CLAIMS UNDER SECTION 13(b) AND RULE 13b2-1 OF THE EXCHANGE ACT WITH RESPECT TO GEOGRAPHY ENTRIES

Local Counsel

John E. Birkenheier (No. 6270993)

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION

175 West Jackson Boulevard
Chicago, Illinois 60604

John D. Worland, Jr. (No. 90785343)
Richard B. Skaff (admitted pro hac vice)
Robert W. Pommer, III (No. 90785340)

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION

100 F Street, N.E.
Washington, D.C. 20549-0911

# TABLE OF CONTENTS

                                                                                                         <u>Page</u>

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       James E. Koenig's Responsibilities. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       The Geography Entries. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       Koenig's Responsibility for the Geography Entries . . . . . . . . . . . . . . . . . . . . . . . 3

       New Management's Discovery of the Geography Entries
       and Inability to Obtain Support . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       Koenig's Inability to Provide Justification. . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

ARGUMENT

I.     THE STANDARDS FOR THIS MOTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

II.    PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST
      KOENIG WITH RESPECT TO THE CLAIMS UNDER EXCHANGE ACT
      RULE 13b2-1 WITH RESPECT TO THE GEOGRAPHY ENTRIES. . . . . . . . . 10

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## INTRODUCTION

This motion relates to unsupported and fictitious accounting entries that were recorded at the direction of James E. Koenig in the books and records of Waste Management, Inc. ("Waste Management" or the "Company"). In preparing its publically reported financial statements for the 1993 through 1996 period, the Company recorded these miscellaneous reclassification entries – dubbed by those involved in the process as "geography" entries – on a quarterly basis for external reporting purposes only. The people contemporaneously involved in recording the entries – from the staff accountants on up to the Chief Accounting Officer of the Company – were never given support or any business reason or justification for the entries. Indeed, after years of investigation and more that 200 days of sworn testimony, no witness has offered a valid reason for the entries. The only explanation offered for the geography entries – the explanation by Koenig himself and the people who helped him – was that the entries were a convenient way to make the financial statements look the way Jim Koenig wanted the financial statements to look.

When new management discovered the unsupported accounting entries in the summer and fall of 1997, an investigation was commenced, and the prior years' geography entries were ultimately reversed. This decision was made in consultation with the audit committee of the board of directors and the Company's longtime auditors, Arthur Andersen. The decision was made after an extensive review that involved a search of Company records, interviews with all key accounting and reporting personnel contemporaneously aware of the entries, consultation with Arthur Andersen, and even two separate interviews of Koenig. In total, the Company identified and corrected over $260 million in unsupported geography entries for the 1993 and 1994 annual periods and the 1995 and 1996 quarterly periods.

The conduct at issue here was clearly illegal. Maintaining accurate books and records of a company is "one of the foundations of the system of corporate disclosure embodied in the Securities Exchange Act." You cannot just make stuff up.

Accordingly, for violating his public trust, and the rule that prohibits such basic malfeasance, summary judgment should be granted against Koenig on this claim with respect to the "geography" entries.

1

## STATEMENT OF FACTS

The following is a summary of the Commission's Statement of Material Facts Not in Dispute ("Facts"), which is being submitted separately together with an Appendix of Evidentiary Material cited in support of the statement.[1]

### James E. Koenig's Responsibilities

James E. Koenig was the former executive vice president and Chief Financial Officer of Waste Management. Koenig signed Waste Management's periodic reports on Forms 10-K and 10-Q and registration statements, as CFO. Facts ¶ 62. Koenig signed annual representation letters to Arthur Anderson in connection with the Company's preparation of the 1992 through 1996 financial statements. Id. ¶ 63. For those financial statements, Koenig certified that he was responsible for the fair presentation in the Company's consolidated financial statements of financial position, results of operation and cash flows in conformity with generally accepted accounting principles. Id. Among other things, Koenig certified that "[t]he accounting records underlying the financial statements accurately and fairly reflect, in reasonable detail, the transactions of the Company and its subsidiaries." Id. (quoting February 5, 1996 letter from Koenig, et al. to Arthur Andersen (SEC Exhibit 150) at AA0048397).

### The Geography Entries

Ron Jericho was the longtime vice president of reporting in charge of the Consolidations and Reporting Department of Waste Management. Facts ¶ 46. John Marek was a senior member of the Consolidations and Reporting Department. Id. ¶ 48. The Consolidations and Reporting Department prepared the consolidated financial statements and public reports of the Company. Id. ¶ 16 (citing Declaration of Hebert J. Anders, December 13, 2005 ("Anders Decl.")). In so doing, the department prepared the consolidating adjustments, sometimes referred to as "top level adjustments," and maintained the related workpapers. Id. This included all historical

---

[1] The statement of facts summarizes the Commission's Statement of Material Facts Not In Dispute in Support of this Motion, and the Appendix thereto. Copies of the underlying documents are attached to the Declaration of Robert W. Pommer III ("Pommer Decl.") submitted in support of this motion. The Appendix provides, for each numbered paragraph of the statement, the evidential material cited therein. Complete copies of the testimony transcripts (in minuscript version) are separately provided in the Pommer Declaration. At defendants' request, min-u-script versions of the testimony transcripts, rather than full-page transcript versions, were produced. (Letter of Robert W. Pommer, III to Sarah R. Wolff, dated June 28, 2002.) The Commission has available for review or submission the full versions.

2

records related to the consolidating adjustments. Id.

Both Jericho and Marek testified that Hau regularly provided the department "miscellaneous reclassification" entries, referred to as "geography" entries, to record as a consolidating adjustment. Id. ¶¶ 48-55. However, they were never provided with documentary support or business reason or justification for the entries. Id. During their testimony, Jericho and Marek identified in the Company's accounting workpapers the specific geography entries were recorded in the Company's financial statements. Id. ¶¶ 51-55. For example, Jericho identified journal entries 139 and 145 as geography entries for 1993 for which his department was not given support. Id. ¶51. Jericho identified journal entries 114, 128, and 141 as the geography entries for 1994 for which his department was not given support. Id. ¶52. Similarly, Marek identified during his testimony, for the 1995-96 reporting periods, a Company business record that "identif[ies] all of those entries that were reclassifications that we did not have support for." Id. ¶¶ 53-54 (discussing Exhibit 1337, "Miscellaneous Reclass Entries, December 31, 1996"). That schedule identifies, as unsupported reclassifications, journal entry numbers 127/114 recorded for the 1995 and 1996 quarterly periods. Id. see also Facts ¶ 55 (Jericho testimony regarding the same schedule).

**Koenig's Responsibility for the Geography Entries**

Thomas C. Hau was vice president, corporate controller, and Chief Accounting Officer of Waste Management from 1990 to October of 1997. Facts ¶ 8. Hau was the senior most accountant in the Company, and reported directly to Koenig, as CFO. Id. ¶ 8.

In testimony, Hau identified Koenig as being solely responsible for the geography entries. Id. ¶ 42. He testified that Koenig initiated and approved the reclassification entries and had the "ultimate responsibility" for determining amounts of the entries. Id. Hau testified about Keonig's responsibility for the entries:

> Q  Who decided on the reclasses?
>
> A  Again, the ultimate responsibility was Mr. Koenig.
>
> Q  Who decided what these amounts in this entry should be?
>
> A  The ultimate decision on the entry and the amounts was Mr. Koenig's. [Facts ¶ 42 (quoting Hau testimony)].

3

Hau explained that the reclassification entries were made when "the financial statements did not reflect what Mr. Koenig believed were the realities of the business." Facts ¶ 43 (quoting Hau testimony). Despite the fact that the Company's accounting workpapers typically identified a geography entry with the description "reclasses per T. Hau," Hau was unable to identify any support or business reason for entries. Id. ¶¶ 43-44; Anders Decl. Ex 1 at WMI 102604, Ex 2 at WMI 102600. In fact, in testimony Hau did not even attempt to defend the entries, stating that he had no opinion one way or another whether the reclassification entries reflected the true operating realities of the business. Facts ¶ 44. Indeed, Hau was unaware of **anyone** other that Koenig who even expressed an opinion on whether the reclassification entries reflected the operating realities of the business. Id.

Bruce D. Tobecksen was the vice president of finance at Waste Management from March of 1993 through December of 1997. Id. ¶ 7. He reported directly to Koenig as CFO. Id. Tobecksen's job responsibilities included assisting Koenig with investor relations and special projects. Id. One of those "special projects" involved the geography entries. Id. ¶¶ 45-46.

Like Hau, Tobecksen identified Koenig as the one responsible for the geography entries. Id. ¶ 45. He testified about how the amounts for the geography entries were determined. Tobecksen explained that Koenig asked him to compare the quarterly preliminary numbers with the prior quarter's financial numbers to identify variances that might lead to "questions . . . by the analyst community with respect to the change in operations." Id. (quoting Tobecksen testimony). Tobecksen provided the analysis to Koenig, and geography entries were then made to reduce the variances that would be reported in the Company's public reports. Id. ¶¶ 45-46. Stated another way, Koenig changed the publically filed reports with geography entries to conceal quarter-vs-quarter variances that otherwise might lead analysts to question him about the Company's financial results.

### New Management's Discovery of the Geography Entries and Inability to Obtain Support

Beginning in 1997, the Company's senior management responsible for corporate accounting and reporting changed. In late January 1997, John Sanford replaced Koenig as the Chief Financial Officer of the Company. Id. ¶ 5. Mark Spears became assistant corporate controller of Waste Management in July of 1997 with the plan to become controller upon Tom Hau's retirement. Id. ¶ 23. Spears became controller in early November 1997. Id. In August of

4

1997, Hebert J. Anders became Director of Consolidations and Reporting, replacing Ron Jericho. Id. ¶ 15. Don Chappel, the former vice president and corporate controller of Waste Management of North America, became the acting CFO of the Company following Sanford's resignation at the end of October 1997. Id. ¶¶ 14, 22.

These executives, while longtime employees of the Company, were new to the corporate accounting and reporting departments and had not previously been aware of the geography entries. Id. ¶¶ 5-6, 17, 22, 24. During the summer and fall of 1997, Sanford, Spears, Anders, and Chappel searched company records, interviewed Hau, Jericho, Tobecksen, Marek, and Koenig but could not find any known purpose for the geography entries. Id. ¶¶ 5-29.

Sanford first learned about the prior year's reclassification entries in a July 1997 meeting with Tobecksen and Hau. Id. ¶ 6. The reclassification entries were explained to Sanford as "reclassifying . . . money among revenue categories and money among certain expense categories." Id. ¶ 9 (quoting Sanford testimony). In this meeting, no economic basis and no accounting basis was provided by Hau or Tobecksen for the reclassification entries. Id. ¶ 10. Instead, Tobecksen explained to Sanford, "we can't explain the numbers the way they are so we just move money around among categories. . . . It was a convenient way of being able to explain the results." Id. (quoting Sanford testimony). Sanford testified:

> And the response from Bruce [Tobecksen] was, well, we can't explain the numbers the way they are so we just move money around among categories. This was a startling revelation to say the least. We discussed it. I -- there was no explanation, there was no economic basis, there was no accounting basis. It was simply to be able to explain to the outside world what the results were. It was a convenient way of being able to explain the results. [Facts ¶ 10]

Sanford was stunned by the revelation. Id. ¶¶ 11-13. He resigned from the Company in late October of 1997. Id. ¶ 14.

Anders and Spears spearheaded the investigation into the geography entries. Among other things, they interviewed Hau, Jericho, and Marek to review the workpapers and inquire whether they knew of the purpose for the geography entries. Id. ¶¶ 18-21, 24-25. Anders documented the investigation in a series of workpapers. Id. ¶ 19. The workpapers identify the geography entries for which there was no known purpose, summarize the steps Anders took to investigate the entries, document his consultations with Hau, Jericho, and Marek, attach the

5

original workpapers showing the geography entries, and identify the reversing journal entries that were recorded to undo the geography entries. Id. ¶ 19-21 (discussing Anders Decl. Ex's 1 through 4).

In certain instances, Anders took additional steps to attempt to discover if there was some purpose for the entries. Id. For example, unlike the entries for 1995 and 1996, two of the three journal entries identified as geography for 1994 (Journal Entry Nos. 114 and 128) were not in round numbers. Id. ¶ 20-21 (discussing Anders Decl. Ex 3 at WMI 102592). Likewise, the journal entries identified as geography for 1993 (Journal Entry Nos. 139 and 145) were not in round numbers. Id. ¶ 20-21 (discussing Anders Decl. Ex 4 at WMI 102590). Additional efforts were taken, including specific discussions with Hau, Jericho, and Marek about the fact that entries were not rounded. Facts ¶¶ 20-21. They were still unable to provide any support or purpose for the entries. Id.

**Koenig's Inability to Provide Justification**

Because they were unable to obtain support or even a known purpose for the geography entries through the discussions of those contemporaneously involved in the recording of the entries and review of the Company workpapers, Chappel and Spears decided to talk to Koenig before making a final decision on reversing the geography entries. Id. ¶¶ 26-29. Chappel testified:

> So we agreed that before we decided that we had errors that we would at least ask Jim if he had any support, because Tom with a [sic] so often say, "See Jim." So we decided that we would call Jim and ask Jim if he had any support for the entries before we decided to revise previous filings and ignore those types of entries for the third quarter itself. So I suggested that, and Herb Getz and Mark Spears along with Walt Cercavschi from Arthur Anderson and I placed a call to Jim at his home. [Facts ¶26]

In a November 7, 1997 telephone call, Spears and Chappel spoke with Koenig. Koenig was unable to provide valid support for the entries. Id. ¶ 27. Chappel testified that "Jim [Koenig] generally answered our questions with a question and, you know, suggested a lot of different places to look, but he didn't have any support whatsoever." Id. ¶ 28 (quoting Chappel testimony). Spears explained that "[Koenig] indicated or he communicated that geography was entries being

6

made to show the income statement the way he wanted to." Id. ¶ 29 (quoting Spears testimony). In his deposition, Spears testified about the conversation with Koenig as follows:

> Q  In this conversation did anyone ask Mr. Koenig what he meant by geography entries?
>
> A  Yes. He just said -- he said by geography entries we're just talking about some numbers that we just reclassify things on the income statement where it made a little more sense. That's really all he said.
>
> Q  Did you ask for -- did anyone ask for a further explanation about what he meant?
>
> A  I think somebody said, what, like window dressing, trying to make the thing, you know, look a different way than the way the numbers rolled up, and he kind of said yes. [Spears Vol. 1 TR. at 160-61]
>
> \* \* \* \*
>
> Q  And what did Mr. Koenig say he meant by geography?
>
> A  He indicated -- and I really can't quote the exact words because it's back in 199 -- whatever, '97, and we're in 2003 now. **He indicated or he communicated that geography was entries being made to show the income statement the way he wanted to. That was the communication.** I can't tell you the exact words verbatim because I didn't record it and I didn't write it down word for word. [Facts Id. ¶ 29 (quoting Sears testimony, emphasis added)]

During the first week of November 1997, Rod Hills became a member of the Waste Management board of directors and was appointed Chairman of the audit committee. Id. ¶ 30. When told about Koenig's explanation for the geography entries, Hills insisted upon talking to Koenig personally. Id. ¶¶ 31-33. As a result, a telephone call between Hills and Koenig was arranged. Id. ¶ 33. Hills testified that the call took place within a week after he joined the Company. Id.

During the call, Koenig did not ask for any documents to help demonstrate his explanation for the entries. Id. Koenig "accepted the fact that he was responsible" for the entries. Id. ¶ 34 (quoting Hills testimony). In his deposition, Hills testified:

7

> Q. And did Mr. Koenig deny knowledge or disclaim responsibility for the entries?
>
> .... A. He accepted the fact that he was responsible for the numbers being there. I don't recall that he referred to anybody else who told him that those numbers should be there. On the other hand, he didn't -- he didn't say to the contrary. [Facts ¶ 34 (quoting Hills testimony)]

In the telephone call, Koenig explained to Hills that "he knew what the balance sheet and what the financial statements should look like, and if they didn't look correct to him, he put those numbers in." Id. ¶ 35 (quoting Hills testimony). Koenig explained to Hills, "'I've been in this business for a very long time, both before I came to Waste Management and since, and I can say to you that I had to put these entries in because they would be more accurate with them in than with them out.'" Id. During his deposition, Hills testified:

> Q. Sir, what do you recall of that conversation?
>
> A. I introduced myself. Mr. Koenig was quite friendly, quite willing to cooperate. And I said I had been made aware that there were items on the balance sheet and the financial statements referred to as geography, and could he explain to me what those were, what the basis for those entries were.
>
> Q. And what do you recall Mr. Koenig saying?
>
> A. I cannot -- The conversation lasted more than a few minutes. I don't think it lasted a half hour, but it lasted a while. The best that I could get from it was that he and the others at Waste Management understood the Waste Management business better than the external auditors, that they were very experienced, and that he knew what the balance sheet and what the financial statements should look like, and if they didn't look correct to him, he put those numbers in. [Facts ¶ 35 (quoting Hills testimony)]

The implication of Koenig's explanation was that the "geography entries were made to make the financial statements look the way Jim Koenig wanted them to look." Id. ¶ 36 (quoting Hills testimony). Hills testified that was "astonished" by Koenig's inability to provide a sufficient or "logical basis" for the entries. Id. ¶ 37-38 (quoting Hills testimony).

Before making a final decision on the reclassification entries, Spears and Chappel asked Walter Cercavschi, a longtime member of the Arthur Andersen engagement team, whether

8

Andersen was ever provided "justification or support" for the geography entries. Id. ¶ 39 (quoting Chappel testimony). They were told that Andersen "didn't have any." Id.; see also Facts Id. ¶¶ 56-57 (citing Cercavschi testimony). In fact, Bob Allgyer testified that Andersen did not audit the income statement reclassification entries because the entries were below Andersen's audit scope. Id. ¶¶ 58-61. Thus, because the entries were below the audit scopes, Andersen would not have looked for support for the reclassification entries at the time they were recorded. Id.

Based upon the lack of support and the inability to confirm whether the entries fairly reflected a business transaction, it was decided that all of the geography entries for which there was no known purpose would be reversed. Id. ¶ 40. The following chart, set forth in the Anders Decl. ¶ 13, identifies (by reporting period and journal entry number) the geography entries for which there was no known purpose and quantifies the total amount reclassified between income statement line items:

| Period | Journal Entry Nos. | Amounts Reclassified |
|---|---|---|
| 1993 (year end) | 139, 145 | $ 56,481,395 (net) |
| 1994 (year end) | 114, 128, 141 | $ 33,140,138 (net) |
| Q2 1995 | 127 | $ 16,000,000 |
| Q3 1995 | 114 | $ 14,600,000 |
| Q4 1995 | 114 | $ 22,000,000 |
| Q1 1996 | 114 | $ 6,000,000 |
| Q2 1996 | 114 | $ 26,700,000 |
| Q3 1996 | 114 | $ 33,300,000 |
| Q4 1996 | 114 | $ 53,000,000 |
| | **TOTAL** | **$ 261,221,533** |

Facts ¶ 41.

## ARGUMENT

### I. THE STANDARDS FOR THIS MOTION.

The Commission incorporates its discussion of the standards on this motion from its memorandum of law in support of the accompanying motion for summary judgment based upon the Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act with respect to 1995 financial representations, and respectfully refers the Court to that discussion.

### II. PARTIAL SUMMARY JUDGMENT SHOULD BE GRANTED AGAINST KOENIG WITH RESPECT TO THE CLAIM UNDER EXCHANGE ACT RULE 13b2-1.

Section 13(b)(2)(A) requires issuers subject to the Exchange Act's reporting provisions to "make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer." 15 U.S.C. § 78m(b)(2)(A) . Rule 13b2-1 provides that "[n]o person shall, directly or indirectly falsify or cause to be falsified, and book, record or account subject to section 13(b)(2)(A) of the Securities Exchange Act." 17 C.F.R. § 240.13b2-1 (1988). In adopting the rule, the Commission stated that "the maintenance of accurate books and records by reporting companies is one of the foundations of the system of corporate disclosure embodied in the Securities Exchange Act," and "'is a necessary concomitant of the existing requirement for full, fair, and accurate periodic reports.'" Release No. 34-15570, 1979 WL 173674 at *8 (Feb. 15, 1979).

There is no scienter requirement for Rule 13b2-1. E.g., SEC v. McNulty, 137 F.3d 732, 740-41 (2d Cir.), cert. denied, Shanklin v. SEC, 525 U.S. 931(1998); SEC v. Sys. Software Assocs., Inc., 145 F. Supp.2d 954, 958 (N.D. Ill. 2001); SEC v. Softpoint, Inc., 958 F. Supp. 846, 865-66 (S.D. N.Y. 1997) ("There is no scienter requirement; liability is predicated on 'standards of reasonableness.'"), quoting Exchange Act Release No. 34-15570, 1979 WL 173674 at *10. Nor is there a "materiality" requirement.[2]  See Release No. 34-15570, 1979 WL 173674 at *8,

---

[2] While not required for this motion, the Commission will be prepared at trial to prove that both such elements are satisfied as to the geography entries and the misleading disclosures to which they led, and that Koenig also violated the anti-fraud provisions of the securities laws with these entries. Indeed, Koenig's explanation for the entries, in and of itself, establishes materiality and his scienter.

10

10 (the "requirement is qualified by the phrase 'in reasonable detail' rather than by the concept of 'materiality'"); SEC v. Softpoint, Inc., 958 F. Supp. at 865-66.

The undisputed facts demonstrate here that Koenig violated Rule 13b2-1 by falsifying Waste Management's books records, and accounts subject to Section 13(b)(2)(A) the Exchange Act.[3] First, Koenig was responsible for the geography entries. Over $260 million in unsupported geography entries were recorded and incorporated in the Company's publically filed financial reports during the 1993 through 1996 reporting periods. Facts ¶ 41. Hau and Tobecksen, both of whom reported directly to Koenig and were involved in the process of recording the entries, testified that Koenig made the determination of what the geography entries should be. "The ultimate decision on the entry and the amounts was Mr. Koenig's." Facts ¶ 42 (quoting Hau testimony). The geography entries were made "[a]t Mr. Koenig's instruction." Facts ¶ 46 (quoting Tobecksen testimony). Koenig admitted this in his telephone interviews with Chappel and Spears and then Hills. Facts ¶¶ 29, 34.

Second, by his own admission, Koenig was responsible for the fair presentation of the company's financial information in the consolidated financial statements. Among other things, he certified in annual representation letters to the auditors that "[t]he accounting records underlying the financial statements accurately and fairly reflect, in reasonable detail, the transactions of the Company and its subsidiaries." Id. ¶ 63.

Third, those contemporaneously involved in recording the entries were never given support or any business reason or justification for the entries. Id. ¶¶ 42-54 (discussing Hau, Tobecksen, Jericho, and Marek testimony). After an extensive investigation, new management could not locate support. Id. ¶¶ 5-41. Indeed, no witness has offered a valid reason for the entries.

Finally, if there is any doubt that the geography entries were nothing more than fictitious accounting entries, one need only look at how the entries were described by those who knew:

> "He [Koenig] indicated or he communicated that geography was entries being made to show the income statement the way he wanted to. That was the communication." [Facts ¶ 29 (quoting Spears testimony on *Koenig's explanation*);

---

[3] The Commission's claims against Koenig for falsification of books and records are found in Claim Three of the Commission's Complaint.

11

> "[Koenig] knew what the balance sheet and what the financial statements should look like, and if they didn't look correct to him, he put those numbers in." [Facts ¶ 35 (quoting Hills testimony on **Koenig's explanation**);

> "[w]e made reclassifications to attempt to get the financial statements to reflect what we believed was, in fact, what he [Koenig] believed was, in fact, the operations of the company. [Facts ¶ 43 (quoting *Hau* testimony)];

> "Mr. Koenig asked me to track quarterly presentation of profit and loss line items with prior quarter for items that would have large variances for purposes of things that would be -- questions that might be asked by the analyst community with respect to the change in operations at the company." [Facts ¶ 46 (quoting *Tobecksen* testimony)];

> "And the response from Bruce [Tobecksen] was, well, we can't explain the numbers the way they are so we just move money around among categories. . . . It was a convenient way of being able to explain the results." [Facts ¶ 10 (Sanford's testimony on **Tobecksen's explanation**)].

It strains credulity to suggest that these explanations demonstrate a proper justification for the entries. To the contrary, the geography entries were completely fictitious and false. Accordingly, summary judgement should be granted against Koenig for violating Rule 13b2-1. E.g., SEC v. Kahn, 2002 WL 1163723 at *13 (granting summary judgment against CEO and Vice President for violating Rule 13b2-1); SEC v. Softpoint, Inc., 958 F. Supp. at 965-66 (granting summary judgment against president of company, who signed annual disclosure, for violating Rule 13b2-1 for "deciding to retain fictitious entries and payments in [the company's] accounts receivable ledgers"); SEC v. Gallagher, 1989 WL 95252 at *7-8 (granting summary judgment against controller who was responsible for company's financial reports and accounts, and signed its filings with the Commission, for violating Rule 13b2-1). See generally SEC v. Buntrock, 2004 WL 1179423 at *10 (N.D. Ill. 2004) (and cases cited therein).[4]

---

[4] Koenig admitted jurisdiction and venue in this Court in his Answer, ¶¶ 20-23 (although denying liability).

12

## CONCLUSION

For the reasons set forth above, with respect to Claim Three in the Commission's Complaint, this Court should grant partial summary judgment against Koenig under Section 13(b) of the Exchange Act and Rule 13b2-1 for his role in the geography entries.

Dated: December 15, 2005

Respectfully submitted,

Local Counsel

John E. Birkenheier (No. 6270993)
Securities and Exchange Commission
175 West Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone (312) 886-3947

John D. Worland, Jr. (No. 90785343)
Richard B. Skaff (admitted pro hac vice)
Robert W. Pommer, III (No. 90785340)
Attorneys for Plaintiff
Securities and Exchange Commission
100 F. Street, N.E.
Washington, D.C. 20549-4010
Telephone (202) 551-4438 (Worland)
Fax (202) 772-9245 (Worland)

## CERTIFICATE OF SERVICE

This is to certify that I have caused a copy of the Securities and Exchange Commission's Memorandum in Support of Motion for Partial Summary Judgment against Defendant Koenig for Claims under Section 13(b) and Rule 13b2-1 of the Exchange Act with respect to Geography Entries to be served upon the persons listed below by Overnight Mail on this 15th day of December, 2005:

> Sarah R. Wolff, Esquire
> Jonathan S. Quinn, Esquire
> Matthew J. O'Hara, Esquire
> Lisa Kellmeyer, Esquire
> SACHNOFF & WEAVER, LTD.
> 10 South Wacker Drive,
> Chicago, Illinois 60606

**Attorneys for Defendant James E. Koenig**

_____
Robert W. Pommer III