**APPENDIX TO**

**SECURITIES AND EXCHANGE COMMISSION'S OPPOSITION
TO KOENIG'S MOTION FOR PARTIAL SUMMARY JUDGMENT
ON GROUNDS OF IMMATERIALITY**

# TAB 1.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> DEAN L. BUNTROCK, PHILLIP B. ROONEY, ) <br> JAMES E. KOENIG, THOMAS C. HAU, ) <br> HERBERT A. GETZ, and BRUCE D. TOBECKSEN, ) <br> ) <br> Defendants. ) <br> ) | NO: 02 C 2180 <br><br> **RECEIVED** <br><br> JUN 2 5 2004 <br><br> MICHAEL W. DOBBINS <br> CLERK, U.S. DISTRICT COURT |

### DEFENDANT JAMES E. KOENIG'S ANSWER AND
### AFFIRMATIVE DEFENSES TO COMPLAINT

Defendant James E. Koenig ("Koenig"), by his undersigned attorneys, for his answer and affirmative defenses to the Plaintiff's Complaint states as follows[1]:

### SUMMARY

1. This action concerns a massive financial fraud motivated by greed and a desire to preserve professional and social status. The defendants were the highest-ranking officers of Waste Management, Inc. ("Waste Management" or "Company"), the world's largest waste services company. From at least 1992 through part of 1997, Dean L. Buntrock - Waste Management's chief executive officer ("CEO") and founder - and the other defendants engaged in a systematic scheme to falsify Waste Management's earnings and other measures of financial performance. As part of the scheme, they concealed the operating realities of the Company by making or authorizing false and misleading statements about the Company's financial performance to investors, the public, and the Commission. Defendants manipulated the Company's financial results to meet predetermined earnings targets and thus retain their executive positions, reap substantial performance-based bonuses and, in certain instances, enhanced retirement benefits. While the fraud was ongoing and the Company's stock price was inflated, defendants Buntrock, Phillip B. Rooney, and James E. Koenig unloaded Company stock on unsuspecting investors. Their sales enabled them to avoid millions of dollars of losses. Other

---

[1] Plaintiff's Complaint includes numerous subject headings that Koenig does not believe requires answers. However, to the extent that answers are required, Koenig denies the allegations, implications, and inferences of each such heading.

ANSWER:

Koenig lacks knowledge or information sufficient to form a belief as to the truth of the averments in paragraph 284, and therefore denies same.

285. Finally, the MD&A failed to disclose the netting of the ServiceMaster II gain and, in fact, misrepresented the accounting for the transaction. The MD&A falsely reported that the gain had been recorded in Sundry Income: "Sundry income previously consisted primarily of earnings from the investments in Wessex and ServiceMaster. The decline in sundry income in 1997 [$12.5 million for the first quarter of 1997 $17 million for the same quarter in 1996] reflects the loss of this income, partially offset by a gain recognized when the ServiceMaster shares were reclassified as trading securities and marked-to-market." In fact, had the gain been properly recorded without the netting, the reported Sundry Income would have increased by $129 million representing a substantial quarter-to-quarter increase, not the slight decline reported in the financial statements.

ANSWER:

Koenig lacks knowledge or information sufficient to form a belief as to the truth of the averments in paragraph 285, and therefore denies same.

286. In mid-July of 1997, Buntrock was replaced as Chairman and CEO. However, Buntrock had one more accounting entry to make before handing over the reigns of his company to the new CEO. Buntrock directed Hau to create a $5 million reserve to fund a charitable donation he wanted the Company to give his college alma mater for the construction of "Buntrock Commons" in his honor. Buntrock's successor later reversed the entry as soon as he discovered it.

ANSWER:

Koenig admits that in mid-July of 1997, Buntrock was replaced as Chairman and CEO. Koenig lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations in paragraph 286 and therefore denies same.

THE SCHEME UNRAVELS

*New Management and the Third Quarter 1997 Charge*

287. In attempting to explain the quarter-to-quarter trends in 1997, new management was forced to confront the "one-off" problem - the true picture of the Company's 1997 results was skewed by the non-recurring items (and other misclassifications) from 1996 that inflated the

prior year's reported results. Instead of recording new accounting entries to "replace" the prior year's entries, the new CEO ended the practice and initiated a comprehensive review of the Company's prior accounting practices. A new financial and accounting team was assembled to probe deeper into the Company's prior accounting practices.

### ANSWER:

Koenig admits that in mid-1997, the Company's Board of Directors appointed a new chief executive officer, and that this person began a review of all of the Company's operations, accounting, marketing, and administrative functions to bring himself up to speed, and admits that some new individuals were brought into the financial and accounting area. Koenig lacks knowledge or information sufficient to form a belief as to the truth of the remaining averments in paragraph 287, and therefore denies same.

288. On October 10, 1997, the Company issued a press release admitting that the Company's reported earnings from continuing operations for the third quarter of 1996 had been materially inflated by 20% due to the inclusion of the non-recurring items. In particular, the release stated that "earnings for the third quarter of 1996 were benefited [approximately $0.09 to $0.11 per share] by certain non-recurring items, including gains on sales of divested operations, income from settlement of claims against insurance carriers, and lower depreciation and casualty claim expense in the quarter." The press release further noted that the Company was conducting an analysis of its North American operating assets and investments to determine whether they were appropriately valued.

### ANSWER:

Koenig admits that the SEC has accurately quoted small portions of the document referenced but states that the entire document is the best evidence of its contents. Koenig lacks knowledge or information sufficient to form a belief as to the truth of the remaining averments in paragraph 288, and therefore denies same.

289. Following the issuance of the October 10 press release, the Company's stock fell almost 10%, from a closing price of $33.75 per share on October 9, 1997, to a closing price of $30.625 per share on October 10, 1997, on extraordinary volume of 10,207,700 shares. Securities analysts commenting on the October 10, 1997 press release stated that the disclosure about the Company's "puffed up" third quarter 1996 earnings indicated that non-recurring income and reserve reversals must have inflated the Company's reported results for the first half