# DECLARATION OF
# ROBERT W. POMMER III

# EXHIBIT    10.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

Plaintiff,

vs.

DEAN L. BUNTROCK, PHILLIP B. ROONEY,
JAMES E. KOENIG, THOMAS C. HAU,
HERBERT A. GETZ, and BRUCE D.
TOBECKSEN,

Defendants.

No. 02C 2180

Judge Wayne Andersen

# EXPERT REPORT OF FREDERICK C. DUNBAR

## SEPTEMBER 27, 2004

# Table of Contents

I. INTRODUCTION ..................................................................................................................1

II. QUALIFICATIONS ..............................................................................................................2
   A. My qualifications ...........................................................................................................2
   B. Materials considered .....................................................................................................2

III. DEFENDANTS' ACTIONS WERE INCONSISTENT WITH ALLEGATIONS IN THE COMPLAINT .........3
   A. Mr. Buntrock, in his role as Chairman and CEO, recommended lower bonuses than
      allowed by Compensation Committee matrices ................................................................3
   B. Defendants bought Waste Management stock, which they would not do if they
      knew it was inflated in value ..........................................................................................5

IV. MEASUREMENT OF ALLEGED NET ECONOMIC GAINS .............................................................6
   A. Alleged net economic gains on bonuses .........................................................................8
   B. Alleged net economic gain on the Supplemental Executive Retirement Plan..................20
   C. Alleged net economic gain on Waste Management, Inc. stock .........................................23
   D. Calculation of Mr. Buntrock's alleged tax benefit from charitable giving........................32
   E. Pre-judgment interest: Defendants' effective gain is equal to incremental after tax
      income.........................................................................................................................32
   F. Alternative restatement .................................................................................................33

V. CRITIQUE OF WEIL REPORT ...............................................................................................33
   A. Assumptions regarding restatements .............................................................................33
   B. Flaws of Weil's bonus and SERP analysis .....................................................................34
   C. Flaws of Weil's analysis of defendants' trading.............................................................37

VI. MISCELLANEOUS ............................................................................................................40

## C. Alleged net economic gain on Waste Management, Inc. stock

### 1. Use of event studies to measure inflation

64. Because trading profits are a function of stock price, defendants' gains, if any, due to the alleged fraud are a function of inflation in the stock price on relevant trading dates. Assuming that there would be a finding that defendants are fully liable for the restatement, we calculate a daily but-for stock price series by estimating stock price inflation due to the alleged fraud. The estimated but-for price is equal to actual price less estimated inflation on that date. Defendants' gains or losses from a stock trade are estimated by multiplying the number of shares bought or sold, respectively, times inflation on the transaction date.

65. Inflation refers to the difference between a stock's historical price level and the price level that would have been observed in the absence of alleged misrepresentations. In this case, the alleged misrepresentations are Waste Management's originally announced earnings. The presence of inflation is assessed by a statistical procedure known as an event study, which tests whether the information allegedly concealed from the public has a statistically significant impact on the price of a company's securities. An event study has two objectives:

a) It determines what portion of a price movement is due to broad market movements, and therefore not related to a company-specific news event, and what portion of a price movement may be attributed to the event; and

b) It measures whether the price movement potentially attributable to the event (variously called "abnormal price reaction" and "excess return") is large enough that it is unlikely to be due to chance and can therefore be assumed to be responsive to the event.

The theory of applying the event study is that the impact on the stock price of the concealed information is the measure of what the impact on the stock price would have been had it been revealed earlier. That is, the impact on the stock price measured by event study is the estimate of inflation when defendants traded their stock under certain conditions. These conditions include that the disclosure has a statistically significant effect on the stock price return. In addition, the information in the disclosure

must be the same as what was allegedly withheld from the market and was unexpectedly revealed in discrete events.

66.    These conditions for applying the event study are violated if there are multiple, confounding events on the day in question. The event study may be used, but the price reaction observed on such a day must be parsed into components relating to the various events.

67.    Courts have supported the use of event studies.[47, 48]

68.    An event study begins with the estimation of the historical relationship between the price of the security being examined and broad market indexes. This results in an equation, known as a market model, that can be used to predict the daily return of Waste Management's stock price in the absence of any company-specific events. The excess return of Waste Management's stock price is the observed price change net of the return predicted by the market model. An excess return can be due to such things as events that affect Waste Management's stock but do not affect the rest of the stock market; or it can be due to the inherent volatility of Waste Management's stock, which will always be greater than the volatility of the index used in the market model.

69.    The market model can also be used to measure the statistical significance of the unexplained price change, i.e., the difference between Waste Management's actual return on a day and the return the model would predict based on movements in the market on that day. The academic finance literature describes the standards for event studies, but the basic principle is that the excess return on the day of the event in question is compared to an estimate of the volatility of excess returns. In the instant case, we estimate the volatility using the standard error of the market model; this is

---

[47]    *In Re: Executive Telecard Ltd. Securities Litigation*, 979 F. Supp. 1021 (S.D.N.Y. 1997): "The Expert Witness' failure to conduct a thorough 'event study' would be reason enough to exclude his proposed testimony." An event study should eliminate "that portion of the price decline that is the result of forces unrelated to the wrong."

[48]    *In Re Zonagen, Inc. Securities Litigation*, Civil Action No. H-98-0693 (S.D. Tex. June 13, 2003): "Defendants' expert, Frederick Dunbar, explains that he conducted an event study; a statistical method of measuring the effect of an event on a stock price... and concluded that none of these public statements caused a statistically significant increase in Zonagen stock price.... Defendants have thus rebutted the resumption of reliance by making an uncontradicted showing that the market was not affected by the allegedly culpable statements."

similar to the standard deviation that is used by courts in assessing statistical significance in employment and jury selection litigation. The most widely accepted standard of statistical significance in economics is a 95 percent confidence standard: in the absence of a news event, a price reaction that is statistically significant at the 95 percent confidence level could happen with a 5 percent probability. This standard is basically the same as the Supreme Court's rule of using two standard deviations as the measure of statistical significance.

70.    Under the conditions identified above, inflation is measured by the size of statistically significant, negative excess stock price returns following alleged curative statements.[49] If, as in the case of WMX, alleged misinformation in the market accumulated over time, inflation at earlier dates would be less than the inflation observed at the time of any one disclosure. Under these circumstances, the observed price reaction from the disclosure of the information must be reduced to estimate inflation on earlier trading dates.

*Exhibit 26.     Summary of Net Alleged Economic Gains: Trading*

## 2.  Estimation of a market model for Waste Management, Inc.

71.    We estimate a market model that measures the historical relationship between daily returns to Waste Management stock and daily returns to the S&P 500 index and an index of Waste Management's competitors in the waste industry, where all returns are calculated using natural logarithms ("*ln*"). The purpose of the market model is to estimate excess returns on days in 1997 and 1998 that the complaint alleges were disclosures of accounting fraud. Because the period of the alleged fraud is so long, a market model using 1991-92 data—before the alleged fraud—might not capture accurately the relationship between Waste Management returns and market and industry returns on the disclosure dates in late 1997 and early 1998.[50] Therefore, we estimate the market model over the year

---

[49]    We measure excess returns as the natural logarithm ("*ln*") change in a company's stock price (roughly equal to percentage change in price), controlling for the movements in the market and industry on the date(s) using the historical relationship between daily movements of the company's stock price and daily movements in market and industry prices.

[50]    "... [O]ne would typically like to use an estimation window close to the event because the relation between the company's stock and an index changes over time. Therefore, the closer the estimation window is to the event the more relevant the estimated relation will be." David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," in Roman L. Weil, Michael J. Wagner, and Peter B. Frank, eds., *Litigation Services*
(Footnote Continued)

prior to the first disclosure—October 10, 1996 to October 8, 1997—removing days on which the
company announced news or another party announced news about the company.

> Exhibit 27. *Statistical Models of Daily LN Returns to Waste Management,*
> *Inc. Company Stock*
>
> Exhibit 28. *Events Excluded from Market Model*
>
> Exhibit 29. *Competitor Companies Used to Create Competitor Index*

### 3. Event studies of disclosure dates

72. Because the news about the nature of Waste Management's accounting issues,
culminating in the restatement, came out in more than one disclosure, we performed event studies for
all potentially relevant announcements from October 10, 1997, when an accounting review was
announced, through February 24, 1998, when the details of the restatement were announced. Often,
such disclosures involve both restatement-related and non-restatement-related content; as a result, we
have the problem of confounding news.

73. The most important example of confounding news is the post-market close October 29,
1997 surprise announcement of the resignations of newly arrived CEO John LeMay, CFO John
Sanford and defendant James Koenig. Despite being named in the complaint as a corrective disclosure,
it contained no new information about accounting.[51] Indeed, in the middle of the next trading day,
acting CEO Robert Miller assured the market that prior earnings would not have to be restated. While,
in light of an October 10, 1997 accounting-related announcement, some analysts interpreted the
October 29, 1997 departures as a possible signal of deeper accounting problems, analysts expressed

---

(Footnote Continued)
*Handbook: The Role of the Financial Expert* (New York: John Wiley & Sons, 2001), pp. 19.1 – 19.22. "The second
condition [underlying the event study approach] is that the statistical representation of the return-generating process be
descriptively valid. ... the second condition requires stationarity in the relation between the returns of the stock being
analyzed and the market and industry index returns." M. Laurentius Marais and Katherine Schipper, "Applications of
Event Study Methods in Litigation Services," in Roman L. Weil, Michael J. Wagner, and Peter B. Frank, eds., *Litigation
Services Handbook: The Role of the Accountant as Expert*, 2nd Edition (New York: John Wiley & Sons, 1995), p. 45.9.
Also, "If a market model is to be estimated, the length of estimation period is a design choice. A long estimation period
may yield unstable results, because the series includes a number of interventions that are unrelated to the litigation
question at hand." *Ibid.*, p. 45.18.

[51] The complaint cites four alleged disclosures: October 10, 1997, October 29, 1997, November 14, 1997 and February 24,
1998.

more concern about the loss of leadership and consequent delays in restructuring at Waste
Management.

> Exhibit 30.     Analysts Said a New CEO at WMX Was of Primary Importance
> Exhibit 31.     Analysts Expressed Concerns Beyond Accounting after LeMay's
> Resignation

74.    In estimating any effect on share price of accounting-related inferences from the
October 29, 1997 announcement, it is important to determine what impact, if any, the accounting-
related concerns had on expected future cash flow of Waste Management. This is because the
fundamental value of a stock is the value of the future stream of free cash flow discounted at an
appropriately risk-adjusted discount rate. In making estimates of future cash flows, analysts will not
forecast each future year separately, but will use a formula that grows a base year's cash flow at a
constant rate of growth into perpetuity.[52] In such a model, the key variables are the base year's cash
flow, the growth rate and the risk-adjusted discount rate.

75.    The October 29, 1997 announcement did not have any direct information on how past,
present or future accounting changes would change any of these variables. Indeed, analysts who
commented on the issue post-October 29, 1997 agreed that the effect of accounting changes on cash
flow was somewhere between insignificant and nil. Because of the confidence that they had in the cash
flow projections, the Goldman Sachs analysts were able to value the Waste Management stock on the
basis of a market multiple to 1998 estimated cash flow.

> Exhibit 32.     Analysts Said Accounting Changes Would Not Affect Cash Flow
> Exhibit 33.     Modification of Goldman Sachs Waste Management Valuation on
> November 19, 1997
> Exhibit 34.     EPS Estimates, 1997 and 1998, Pre- and Post-October 29, 1997

76.    The October 29, 1997 announcement caused several analysts to revise down their 1998
EPS estimates. There were several reasons for these revisions—most of which were not related to any

---

[52] Such a growth rate must be less than the discount rate appropriate for these cash flows or else the analyst would be left
with the absurd conclusion that the value of the stock is unbounded.

impact of accounting changes on the value of the stock. One reason for reducing EPS estimates was simply to be consistent with what they understood as a more conservative accounting philosophy by the new management; such changes, though, were not related to valuation of the stock because they did not affect expected future cash flows. Another was a leadership vacuum left by the simultaneous resignations of the CEO and CFO causing, among other things, a likely delay in a long-anticipated restructuring and cost-cutting program that Ron LeMay had been expected to implement. Analysts also mentioned that LeMay could have found that restructuring was more difficult than he, and the market, had anticipated as well as problems with the board. Consequently, analysts reduced their 1998 EPS estimates on average by $0.150 per share shortly after the October 29, 1997 announcement.

77.   Of this reduction, only a fraction could be attributed to accounting related issues that would have an effect on stock price valuation. To understand this, note that the Goldman Sachs valuation cited above forecasts 1998 cash flows starting from the premise that the base for 1998 net income is 1997 net income adjusted for restructuring. Consequently, in this valuation model we can determine how the October 29, 1997 announcement affected the expected future cash flow base by determining what effect it had on analysts' estimates of 1997 earnings—most of which had already been achieved by the time of the announcement. On average, analysts reduced their estimates of 1997 EPS by $0.032. This reduction flowed through to analysts' revised estimates of 1998 earnings and can be used to explain 21 percent of the decline in average expected 1998 EPS that occurred after the October 29, 1997 announcement. This would imply that no more than 21 percent of the post-October 29, 1997 price decline was related to accounting issues.

78.   Event studies uncover statistically significant price reactions to four announcements during the October 10, 1997 to February 24, 1998 period:

| Announcement date | Excess Return before Adjustments for Confounding Factors |
|---|---|
| October 10, 1997 | ($3.09) |
| October 29, 1997 | ($5.49) |
| November 4, 1997 | $1.13 |
| February 24, 1998 | $1.04 |

Exhibit 35.    *Daily Closing Price and Key Events*

Exhibit 36.    *Relevant Public Disclosures*

Exhibit 37.    *Calculations of Abnormal Price Reactions*

79.    As can be seen from the above table, the November 4, 1997 announcement results in a statistically significant price reaction. We cite this finding because it shows the effect of news about non-restatement-related, confounding content in the disclosures identified in the complaint. On November 4, 1997, the appointment of two independent directors was announced; this action addressed market concerns about leadership and corporate governance created by the executive resignations on October 29, 1997.

80.    The table below presents the estimated inflation per share related to news about accounting issues on disclosure dates specified in the complaint. We have included the excess return for October 10, 1997, when news about 1996 accounting issues was given to the market, as well as the excess return for February 24, 1998 when all uncertainty regarding new management's accounting was revealed through a detailed restatement. We have also added 21 percent of the October 29, 1997 price drop related to Mr. LeMay's departure, even though this may include the effect of information unrelated to accounting. We term this the "accounting-related price reaction" to the October 29, 1997 disclosure.

| Announcement date | Excess Return after Adjustments for Confounding Factors |
|---|---|
| October 10, 1997 | ($3.09) |
| October 29, 1997 | ($1.17) |
| February 24, 1998 | $1.04 |
| **Total** | **($3.22)** |

### 4. Inflation build-up with accounting misstatements

81.    Because the amount of alleged accounting overstatement accumulated over time, we calculate inflation as building up over time. We define alleged misstatements as the difference between originally reported earnings per share and restated earnings per share in a quarter; cumulative alleged

misstatements are the sum of alleged misstatements for all quarters announced up to the date in question. Inflation builds up quarterly in proportion to the cumulative level of alleged misstatements to date.

82.   Prior to the final overstated earnings announcement on October 10, 1997, we relate the amount of inflation in WMX stock on any given date with the cumulative amount of alleged misstatements that Waste Management had announced prior to that date. For fiscal year 1992 through 3Q97, Waste Management restated EPS by a total of $2.28. We determine inflation on any given date during the alleged fraud period as a function of the ratio of cumulative EPS misstatements to date to total EPS misstatements of $2.28. Cumulative EPS misstatements build up during the period, peaking with the 3Q97 earnings announcement on October 21, 1997.[53] From April 16, 1992 to October 9, 1997, inflation on any given date is equal to [$3.22 x (cumulative EPS misstatements to date/$2.28)]. From October 10, 1997 through October 22, 1997, 96.81 percent of the total alleged misstatements have already been released, yet inflation already declined by $3.09 following the October 10, 1997 disclosure. For these dates, inflation is equal to $0.03, which is calculated as [$3.22 x 0.9681 - $3.09]. From October 22, 1997 through October 29, 1997, inflation is $0.14, which is the sum of the accounting related price reactions to the remaining two disclosures, in absolute value [|-$1.17 + $1.04|].[54] From October 30, 1997 through February 24, 1998, inflation is -$1.04, the inverse of the positive abnormal price reaction to the February 24, 1998 restatement announcement.

> Exhibit 38.    *Stepwise Calculation of Alleged Inflation*
>
> Exhibit 39.    *Alleged Inflation (graph)*

83.   For any given date, the alleged true value of Waste Management stock is equal to the actual closing price on that date and inflation on that date.

> Exhibit 40.    *Closing Price, Alleged Inflation, and Alleged True Value*

---

[53]   Because the announcement was made after the stock market close, WMX's price was not affected until October 22, 1997.

[54]   As of October 22, 1997, cumulative EPS misstatements to date equal $2.28, so the ratio of cumulative to total misstatements is 1.00.