# DECLARATION OF ROBERT W. POMMER III

# EXHIBIT 11.

```
 1   UNITED STATES DISTRICT COURT
 2   NORTHERN DISTRICT OF ILLINOIS
 3   EASTERN DIVISION
 4   ------------------------------------x
 5   SECURITIES AND EXCHANGE COMMISSION,
 6                        Plaintiff,
                                          Civil Action No.
 7              -against-                 02-CV-2180
 8   JAMES E. KOENIG,
 9                        Defendant.
10   ------------------------------------x
11                        November 14, 2005
                          8:57 a.m.
12
13
14        Deposition of FREDERICK C. DUNBAR, taken
15   by Plaintiff, pursuant to notice, at the offices
16   of the Securities and Exchange Commission, Three
17   World Financial Center, New York, New York,
18   before Harold Brown, a Certified Shorthand
19   Reporter and Notary Public within and for the
20   State of New York.
21
22
23
24
25
```

## Page 2

1  APPEARANCES:
2      JOHN D. WORLAND, JR., ESQ.
         Associate Chief Litigation Counsel
3        Attorney for the Plaintiff
             Securities and Exchange Commission
4        100 F Street, N.E.
             Washington, D.C. 20549-4010
5
6
         SACHNOFF & WEAVER, LTD
7        Attorneys for the Defendant
             10 South Wacker Drive
8            Chicago, IL 60606-7507
9   BY:   JONATHAN S. QUINN, ESQ.
10
11  ALSO PRESENT:
12      David Peloza, Videographer
         LegaLink Action Video
13
14
15
16
17
18
19
20
21
22
23
24
25

## Page 3

1         THE VIDEO OPERATOR: This is the
2  video operator speaking, David Peloza from
3  LegaLink Chicago. Today's date is November 14,
4  2005. Time is 8:57. We are at the SEC regional
5  office, 3 World Financial Center, New York City,
6  the deposition of Mr. Frederick C. Dunbar in the
7  matter Securities and Exchange Commission versus
8  James E. Koenig. I would like the attorneys to
9  introduce themselves starting with the
10 plaintiffs first.
11        MR. WORLAND: Jack Worland for the
12 Securities and Exchange Commission.
13        MR. QUINN: Jonathan Quinn on
14 behalf of the defendant James Koenig.
15        MR. WORLAND: Someone from Bell
16 Boyd at least in spirit.
17        THE VIDEO OPERATOR: You may now
18 swear the witness.
19 Thereupon,
20        FREDERICK C. DUNBAR,
21 being by the undersigned Notary Public first
22 duly sworn, responded as follows:
23        THE WITNESS: I do.
24
25

## Page 4

1  DIRECT EXAMINATION
2  BY MR. WORLAND:
3      Q.   Good morning, Mr. Dunbar.
4      A.   **Good morning.**
5      Q.   My name is Jack Worland. I am an
6  attorney with the Securities and Exchange
7  Commission. I take it you have been deposed
8  before?
9      A.   **I have.**
10     Q.   How many times roughly?
11     A.   **Over 50, less than a hundred.**
12 **Something in that area.**
13     Q.   And you have also testified at
14 arbitrations?
15     A.   **Yes, I have.**
16     Q.   Roughly how many times?
17     A.   **I don't know the answer to that.**
18 **Maybe five or six.**
19     Q.   How about trials?
20     A.   **Yes.**
21     Q.   About how many times?
22     A.   **Probably on the order of 15 plus or**
23 **minus.**
24     Q.   By whom are you currently employed?
25     A.   **NERA Economic Consulting.**

## Page 5

1      Q.   What does NERA stand for?
2      A.   **National Economic Research**
3  **Associates.**
4      Q.   What sort of a business is NERA?
5      A.   **NERA provides economic consulting.**
6  **Basically we are a group of applied**
7  **microeconomists and econometricians. We work on**
8  **issues having to do with public policy or giving**
9  **advisory services to management. We also**
10 **provide counsel in situations where there is**
11 **some kind of a dispute, so that would include**
12 **litigation, regulatory matters, sometimes**
13 **testifying before the Senate or the House of**
14 **Representatives.**
15     Q.   You mentioned microeconomic
16 consulting. Is that opposed to some other type
17 of economics?
18     A.   **The other -- a lot of times when**
19 **people hear about economic consulting I think**
20 **what goes through their mind is that what they**
21 **have read about involves people who forecast how**
22 **the GNP is going to be in the future. We are**
23 **not really in that business.**
24     Q.   Is that forecasting GNP, is that
25 sometimes called macroeconomics?

**Page 6**

1  A. Yes.
2  Q. And macro is Greek for big?
3  A. It is.
4  Q. And micro is Greek for small?
5  A. Correct. How markets work is what
6  we specialize in.
7  Q. Now, so to put a --you might look
8  at competition behavior in a particular
9  industry, but not how the Federal Reserve Board
10 is doing with interest rates, would that be the
11 sort of global --
12 A. How they are doing with interest
13 rates could be an avocation, but that is not our
14 main line of business.
15 Q. Okay. So as opposed to looking at
16 the economy as a whole, you look at individual
17 industries and individual firms, would that be
18 fair?
19 A. Firms, markets, industries. It is
20 basically we look at economic behavior, how
21 incentives work and we also apply our
22 statistical tools to various issues.
23 Q. Do you have any particular --
24 strike that.
25 Is NERA divided into groups in any way?

**Page 7**

1  A. It currently is divided into
2  practice areas, about six -- five practice
3  areas, actually.
4  Q. Could you tell me what those are?
5  A. One is securities and that includes
6  mass torts and various risk management and other
7  advisory services. Second is antitrust which
8  also includes health economics and labor.
9  Third --
10 Q. Did you say labor?
11 A. Yes. A third is intellectual
12 property which also includes transfer pricing,
13 fourth is telecom. That is the communications
14 industry and then fifth is energy which also
15 includes environment and water and
16 transportation.
17 Q. Okay. Are you personally in one of
18 those particular sections?
19 A. Some of us will work in different
20 practice areas. My concentration now is in the
21 securities area. I have worked antitrust and
22 energy.
23 Q. Approximately how many employees
24 does NERA have?
25 A. About 550.

**Page 8**

1  Q. Where are they located?
2  A. There is about 13 or 14 offices
3  worldwide. In the United States, we have
4  offices in Boston, Ithaca, White Plains, New
5  York, Philadelphia, Washington, Chicago, San
6  Francisco and Los Angeles. And we have people
7  who are working in Detroit, Denver and Dallas.
8  We have offices in London, Madrid, Frankfurt,
9  Sao Paulo and Sydney and Tokyo.
10 Q. Now, which office are you located
11 in?
12 A. New York.
13 Q. Now, does NERA work with testifying
14 experts who are not full-time NERA employees?
15 A. On occasion.
16 Q. Would those people be principally
17 academics?
18 A. Academics or individuals who have
19 specific industry capability who are now not
20 necessarily working full-time for their former
21 employer.
22 Q. Now, on -- let's go to this
23 particular project, you testified in this SEC
24 matter. Can you tell us when you were first
25 contacted?

**Page 9**

1  A. I want to say 2003, but I am
2  actually not exactly sure.
3  Q. I am going to show you a document
4  which is -- I won't mark it yet. I will mark it
5  eventually, but I believe it is a letter from
6  you to Mr. John Oberdorfer. The date is August
7  14, 2002.
8  MR. QUINN: And your question is?
9  MR. WORLAND: Ask him if that
10 refreshes his recollection.
11 THE WITNESS: It looks like I was
12 contacted around 2002.
13 BY MR. WORLAND:
14 Q. Does that refresh your recollection
15 as to when you were first contacted?
16 A. A little bit.
17 Q. Do you know who your first contact
18 was?
19 A. It would have been John Oberdorfer.
20 Q. Do you recall who Mr. Oberdorfer
21 represented?
22 A. Mr. Hao.
23 Q. Was your contract with
24 Mr. Oberdorfer and his firm or with the defense
25 in general? Strike it. That is a terrible

**Page 10**

1  question.
2      MR. QUINN: Not great.
3  BY MR. WORLAND:
4      Q.  At the time you were contacted, did
5  you know how many defendants there were in this
6  case?
7      A.  I don't remember.
8      Q.  Do you not remember if you knew or
9  do you not remember how many?
10     A.  I don't remember if I knew.
11     Q.  Did there come a time when you
12 discovered that there was more than one
13 defendant in this case?
14     A.  Most likely.
15     Q.  Do you remember that your report
16 deals with more than one defendant?
17     A.  Sure.
18     Q.  With whom did you actually
19 contract?
20     A.  Well, I think this proposal relates
21 to some work that Andrew Carron did. Later on
22 there came a time when essentially there was
23 sort of a different project and on that one I
24 worked with all the defense counsel.
25     Q.  Okay. You mentioned Andrew Carron?

**Page 11**

1      A.  Yes.
2      Q.  Is he identified somewhere in here?
3      A.  Yes, he would be on the third page.
4      Q.  He is a senior vice president?
5      A.  Yes, he is.
6      Q.  That is C-a-r-r-o-n?
7      A.  Yes.
8      Q.  Now, you said he was originally
9  going to work on one project and then you came
10 in to work on another? Did I get that right?
11     A.  Yes, I think this was before some
12 pleadings were filed and he might have been
13 working with counsel on pleadings. I really
14 wasn't involved in that project.
15     Q.  Okay. So there was a project where
16 Mr. Carron was consulting with somebody on the
17 defense side?
18     A.  Yes.
19     Q.  And there was a project where you
20 were asked to prepare an expert report?
21     A.  Yes.
22     Q.  Okay.
23     A.  Well, actually, I think what I was
24 asked to do is to prepare for a mediation
25 initially.

**Page 12**

1      Q.  I believe you and I actually met at
2  that mediation at least from across the room.
3      A.  Yes.
4      Q.  That was some time in the summer of
5  2003, I believe?
6      A.  Yes.
7      Q.  Does that ring a bell?
8      A.  Yes.
9      Q.  Now, at that time you had already
10 commenced the work that subsequently became your
11 report in this litigation?
12     A.  Yes, at the time of the mediation?
13     Q.  Yes.
14     A.  Correct.
15     Q.  Now, did you do all the work on
16 your report?
17     A.  Me personally?
18     Q.  Yes.
19     A.  No, we had a team.
20     Q.  Can you tell me who was on the
21 team?
22     A.  There were two other people who
23 were at the senior level. One is Elaine
24 Buckberg and the other was Dan Lagattuta. We
25 also had a few researchers who worked on the

**Page 13**

1  team. I can't remember the names of all of them
2  because some of them have left, but one of them
3  was Kevin Kostka and then later another one who
4  worked on it was Brian Saxton.
5      Q.  Could you spell Elaine, could you
6  spell her last name, please?
7      A.  Yes. B-u-c-k-b-e-r-g.
8      Q.  And could you spell Mr. Lagattuta's
9  name?
10     A.  Yes. L-a-g-a-t-t-u-t-a.
11     Q.  And Kostka is --
12     A.  It starts with a K. K-o-s-t-k-a.
13     Q.  And who was the fourth person?
14     A.  Brian Saxton.
15     Q.  S-a-x-t-o-n?
16     A.  Yes. Another person who helped was
17 Tom Porter.
18     Q.  Now, at some point in time did you
19 become aware that other people had looked --
20 strike the question. Sorry about that. What
21 basically at the time of the mediation was your
22 assignment?
23     A.  To estimate the amount of
24 disgorgement.
25     Q.  And what -- what types of

```
                                    14
 1  disgorgement?
 2     A.   There were several types. One was
 3  the bonuses that had been tied to the restated
 4  financials. There was a retirement plan that
 5  itself was related to the compensation of the
 6  executives. There were trading profits or
 7  losses from Waste Management stock transactions
 8  and there was a -- a tax benefit that was
 9  specific to giving done by Mr. Bahran.
10     Q.   And did all of those areas become
11  part of your eventual report in this litigation?
12     A.   Yes.
13     Q.   Were you asked to do anything else
14  besides measure the disgorgement?
15     A.   No.
16     Q.   Did you do anything else besides
17  measure the disgorgement?
18     A.   No.
19     Q.   Do you intend to testify with
20  respect to anything except the measure of
21  disgorgement?
22     A.   No.
23     Q.   Do you know -- tongue-tied. Let's
24  try again. Did you see Mr. Weil's deposition?
25     A.   No.
```

```
                                    15
 1     Q.   Have you read his testimony at all?
 2     A.   I've read parts of it that Elaine
 3  gave me, but I haven't read the whole
 4  deposition.
 5     Q.   Do you understand that if you
 6  testify about disgorgement that will be after a
 7  jury has determined liability issues?
 8     A.   That's what I have been told.
 9     Q.   Okay. So it is your understanding
10  that you are going to testify only if a jury
11  finds liability, otherwise not?
12     A.   Correct. My understanding is that
13  it will be a bench hearing after the trial.
14     Q.   Now, let's take the part of the
15  disgorgement you looked at that dealt with
16  trading profits.
17     A.   Yes.
18     Q.   In the course of doing that work,
19  did you model Waste Management's stock price?
20     A.   Well, the terminology I prefer to
21  use is that we did an event study and as part of
22  the event study, we estimated what is called a
23  market model which is more technically it's a
24  return generating process that can predict what
25  the stock would have done on a given day absent
```

```
                                    16
 1  any other events besides movements in the market
 2  indices.
 3     Q.   As part of that exercise, did you
 4  attempt to estimate how much the stock price was
 5  inflated due to the fraud?
 6     A.   Yes, assuming liability.
 7     Q.   Now, before you got started working
 8  on this, were you aware that lots of other
 9  people had done studies of this previously in
10  connection with other Waste Management-related
11  litigation?
12     A.   I knew there was other Waste
13  Management litigation, but I was not aware of
14  who if any experts had been hired.
15     Q.   Have you looked at the expert
16  reports involving Waste Management of anyone
17  other than Mr. Weil?
18     A.   No.
19     Q.   Did you look at Mr. Ken McGraw's
20  expert report?
21     A.   Oh, I'm sorry, you mean in this
22  matter or in the earlier matters?
23     Q.   Let's start it out globally.
24     A.   Okay. Globally, yes, I did see two
25  other expert reports besides Mr. Weil's.
```

```
                                    17
 1     Q.   And whose were those?
 2     A.   Ken McGraw and Mr. Trenkman.
 3     Q.   And when did you see those?
 4     A.   Actually, just earlier last week.
 5     Q.   Now, have you ever, putting aside
 6  those three reports which were generated in
 7  connection with this litigation in the Northern
 8  District of Illinois, had you seen any other
 9  reports dealing with Waste Management's stock
10  price and litigation involving this fraud?
11     A.   No.
12     Q.   Alleged fraud. Okay. All right,
13  do you know who Richard Leftwich is?
14     A.   Yes.
15     Q.   Who is Mr. Leftwich?
16     A.   Mr. Leftwich is a professor at
17  Chicago Business School and he often works with
18  Lexicon in litigation -- in the litigation area.
19     Q.   Has he ever worked with NERA, to
20  your knowledge?
21     A.   No.
22     Q.   Has Roman Weil ever worked with
23  NERA to your knowledge?
24     A.   I am not sure about that. I don't
25  know on any occasion where he has worked with
```

**Page 18**

1  NERA, but it could be sometimes where he has
2  been on the same side as NERA. He has been
3  without actually working with NERA.
4     Q.   Okay. You referred to something I
5  think you called the market model.
6     A.   Yes.
7     Q.   What did you mean by that?
8     A.   The market model is a way to
9  predict the stock price over a short time period
10 and it is estimated using a regression which is
11 an equation that on the left-hand side has the
12 daily return of a stock price, in this case
13 Waste Management. And then on the right-hand
14 side it has a term often called alpha and in its
15 simplest format, it has a broad based market
16 index, usually the S&P 500.
17        In our case, we use what is called
18 a multifactor market model which only means that
19 there is more than one index on the right-hand
20 side, so we have both in the index that it
21 represents the broad market movements like the
22 S&P 500 and then another index that takes into
23 account industry effects. So the right-hand
24 side has the daily return of the S&P index and
25 then the daily return of an index that is

**Page 19**

1  composed of Waste Management peers. The
2  coefficient on the S&P is also usually called
3  beta and that beta sometimes is used in the
4  capital asset pricing product.
5     Q.   So we are basically talking about
6  an algebraic equation where you have a rate of
7  return for Waste Management equal to A plus B
8  times some index plus C times some other index?
9     A.   Well, it is the return of Waste
10 Management plus A plus B times the return on the
11 index plus C times the return on another index.
12    Q.   But mathematically, it is basically
13 a linear equation?
14    A.   Correct.
15    Q.   Now, what goes into the return on
16 Waste Management? Is it just movement of the
17 stock price? Or do you look at stock dividends?
18    A.   In the way that it is estimated, we
19 are just looking at the price change on a
20 particular day and the -- it's measured by
21 taking, actually, it's the natural log of
22 today's price over yesterday's price which
23 approximates the percent change. The reason
24 that academics use natural logs is that they
25 have good mathematical properties. We do not

**Page 20**

1  adjust the return for the average build-up of
2  dividend between dividend payment periods. That
3  is taken account of by the change in the price
4  of the stock that would occur on the ex-dividend
5  date. The reason for that is that when you --
6  when we want to look at event studies, we want
7  to see what is going to happen on a day-to-day
8  basis rather than looking at the long run
9  return. If we were really interested in
10 comparing Waste Management over the long run to
11 an index, then we would look at reinvested
12 dividend.
13    Q.   Okay. So putting aside the use of
14 logarithms, you are basically taking the ratio
15 of the stock price on day two to the stock price
16 on day one?
17    A.   Well, it's closer to the percent
18 change.
19    Q.   All right.
20    A.   It is like the percent change on a
21 day and the percent change is the change from
22 the prior day.
23    Q.   Okay. So today's price minus prior
24 day's price divided by prior day's price?
25    A.   That is pretty much what is

**Page 21**

1  approximated by taking the log of the ratio,
2  yes.
3     Q.   Now, dealing with the first
4  variable on the right-hand side, the market
5  index, I think you said that was the S&P 500?
6     A.   Yes.
7     Q.   What is it specifically that you
8  are using for the S&P 500? That is just an
9  index of great big stocks, right?
10    A.   That is an index of whatever S&P
11 puts into the 500. It is supposed to be
12 representative of actively traded stocks.
13    Q.   But larger stocks within the
14 economy?
15    A.   It would be larger than say the
16 average stock in the Russell 3000 or in the
17 NASDAQ.
18    Q.   Do you sometimes -- this case
19 involves Waste Management which was at least a
20 Fortune 500 company. I don't know. Do you know
21 if it was in the S&P 500?
22    A.   It might have been at one time, I'm
23 not sure.
24    Q.   But it was at one time a Fortune
25 500 company, I think it is still a Fortune 500

**Page 22**

1  company it is a big company?
2     A.   Okay.
3     Q.   Would you use a different market
4  index if you were looking at a smaller company?
5     A.   You could.
6     Q.   What goes into the variable in the
7  equation that deals with the S&P 500? What is
8  it mathematically?
9     A.   I don't understand the question.
10    Q.   Okay. You've got an algebraic
11 equation on the right-hand side, you have a
12 constant plus a coefficient times something to
13 do with the S&P 500?
14    A.   The percent change in the index.
15    Q.   Okay. And that one as well you do
16 not take into account dividends?
17    A.   Correct.
18    Q.   And then you have a third index
19 which I think you said was the industry index?
20    A.   Yes.
21    Q.   And what goes into that?
22    A.   That is an index which is a measure
23 of the industry stock price effects on any given
24 day, so the S&P 500 takes account of the broad
25 market movements on the price of Waste

**Page 23**

1  Management stock. On the other hand, there may
2  be some industry movements in stock prices that
3  are independent of what is going on in the S&P
4  500. So to capture those effects, we put
5  together an index of Waste Management peers.
6  Sometimes there is already an industry index
7  that S&P has put together, some other data
8  utility has put together.
9        In this case, we went through
10 expert reports to find mentions of Waste
11 Management peers and used that information to
12 find the peers and then we constructed our own
13 index from their stock prices.
14    Q.   You said expert reports. Did you
15 mean expert reports in the litigation context?
16    A.   I'm sorry, if I said expert
17 reports, I misspoke. I mean analyst reports.
18    Q.   And those would be people who work
19 for brokerage houses that follow the industry?
20    A.   Yes, these would mainly be South
21 Side Analysts because their reports are the ones
22 that are public.
23    Q.   Did you include dividends
24 reinvested in your industry index?
25    A.   No.

**Page 24**

1     Q.   Now, Professor Weil did something
2  similar to what you did, did he not?
3     A.   Yes.
4     Q.   And Mr. McGraw did something
5  similar to what you did, did he not?
6     A.   As I understand it.
7     Q.   Now, are there -- the reason you do
8  this is to come to an understanding what the
9  relationship is between Waste Management and the
10 stock market as a whole independent of any fraud
11 or anything like that; is that right?
12    A.   Well, there is two reasons that you
13 do it. One is as you said. The model predicts
14 what the price of Waste Management's stock would
15 be on a given day absent any other events which
16 affect the fundamentals of the stock.
17    Q.   Fundamentals of Waste Management?
18    A.   Of Waste Management or absent
19 anything else that is unusual, okay? The second
20 reason you do it is because the exercise of
21 estimating these models gives us information
22 that we can use to test hypotheses about the
23 price movement of Waste Management. That
24 information relates to the inherent volatility
25 of Waste Management's stock after you've taken

**Page 25**

1  out the effects of market and industry
2  movements.
3     Q.   You said the volatility of Waste
4  Management stock. What did you mean by that?
5     A.   Stock prices have up and down
6  fluctuations that we observe even in the absence
7  of any information coming into the stock -- into
8  the stock market and that's just idiosyncratic
9  volatility for that -- for that stock, so a
10 portfolio of stocks like the S&P 500 has less
11 than one tenth the volatility of an individual
12 stock. That volatility is measured a couple of
13 different ways. The overall volatility is
14 measured by the standard deviation of the
15 returns over time. In the case of the market
16 model, the volatility will be a little less than
17 the standard deviation of the returns because we
18 explain part of that up and down movement with
19 the S&P 500 and the industry index. And what is
20 left over is a statistic that comes out of the
21 regression model and it is usually called
22 standard error of the estimate. I think in
23 Mr. Weil's work papers it is called root mean
24 square error, but I think it's the same thing.
25    Q.   So -- let's suppose we run a market

**Page 26**

1 model regression for -- I'm trying to think of a
2 company we think of as not being volatile. We
3 used to say the phone company. We can't say
4 that anymore. Let's say, I don't know --
5     A.    Electric utility.
6     Q.    An electric utility. Good example.
7 And then we run one for Google.
8     A.    Yes.
9     Q.    Pretty simple to construct an
10 industry index for the electric utility. It
11 will be other electric utilities, right?
12    A.    Yes.
13    Q.    Google might be a little bit more
14 complicated because it's a new business. Can
15 you try to construct an industry index for that
16 as well?
17    A.    You could if you wanted to run a
18 multifactor model. If you were running a simple
19 market model you might use the NASDAQ index.
20    Q.    Having done that, the objective was
21 to remove factors that would cause either the
22 electric utility company or Google's stock price
23 to move by factors other than affect those
24 individual companies?
25    A.    Yes.

**Page 27**

1     Q.    And then you could assess the
2 volatility of the electrical utility and the
3 volatility of Google separately?
4     A.    Yes, that's right. Now, in the --
5 once you have the market model, there is
6 considered to be two types of volatility rather
7 than one. You have the system-wide volatility
8 which is measured by the beta and then you
9 have -- and that is considered to be
10 non-diversifiable. And then you have the
11 idiosyncratic volatility which in theory is
12 considered to be diversifiable and that is
13 measured by the standard error of the estimate
14 from the regression.
15    Q.    Okay. So you could look at things
16 like various -- I don't know what Value Line
17 does, but various stock analyst publications to
18 assess a company's beta.
19    A.    That's correct.
20    Q.    That is the measure of the
21 volatility vis-a-vis the S&P 500 or some other
22 large market index?
23    A.    Yes. That is systematic risk,
24 non-diversifiable risk.
25    Q.    So you have some stocks where if

**Page 28**

1 the market goes up a little, they go up a lot?
2     A.    Yes.
3     Q.    And sometimes the market goes down
4 a little, they go down a lot?
5     A.    Yes.
6     Q.    And that leads to a large beta?
7     A.    Yes, beta greater than one at any
8 rate.
9     Q.    And that is considered to be a more
10 volatile stock?
11    A.    Yes.
12    Q.    Okay. And if it's got a beta less
13 than one, that is a less volatile stock?
14    A.    Yes.
15    Q.    Where was Waste Management?
16    A.    Waste Management, I believe, was
17 pretty close to one, but less than one once you
18 summed up the two coefficients on the model. I
19 think one coefficient would be like .5, another
20 one would be like .4. So it was in the range of
21 1, probably not statistically significantly
22 different from 1.
23    Q.    So in the normal course, absent
24 some event that would change the information
25 about Waste Management, Waste Management

**Page 29**

1 basically moved with the overall market and the
2 industry index?
3     A.    On a daily basis.
4     Q.    Yes.
5     A.    Not necessarily over a long time
6 period, but for a given day.
7     Q.    Now, is that basically the same
8 result that Prof. Weil got?
9     A.    Yes.
10    Q.    Would you like to have your report
11 in front of you, would that make things easier?
12    A.    Sure.
13           MR. QUINN: Mr. Worland, as I
14 mentioned earlier as you are about to mark
15 Dr. Dunbar's report, I'm going to hand you some
16 documents that were provided to me over the
17 weekend. It is actually the only copy I have.
18 I printed them on my home computer. You are
19 obviously free to ask Dr. Dunbar what they are.
20 They were just created, but they should be
21 viewed as part and parcel of that report.
22           MR. WORLAND: Okay.
23           I hand those to you. Let's do
24 this, what is the next exhibit in line, Exhibit
25 2039?

30

1    MR. QUINN: Yes.
2    MR. WORLAND: I would like to have
3 marked as Exhibit 2039 the expert report of
4 Dr. Frederick C. Dunbar in SEC v. Buntrock et al
5 dated September 27, 2004.
6         (Exhibit 2039 for
7 identification, expert report of Dr. Frederick
8 C. Dunbar in SEC v. Buntrock et al dated
9 September 27, 2004.)
10 BY MR. WORLAND:
11   Q.   Do you prefer to be called
12 Dr. Dunbar or Mr. Dunbar?
13   A.   Most of my friends call me Fred.
14 So the less formal the better, I guess is the
15 answer.
16   Q.   Okay. It seems as though the only
17 nonmedical doctors who get called doctors are
18 people who become Secretary of State. Did you
19 ever read Good As Gold?
20   MR. QUINN: Sure.
21 BY MR. WORLAND:
22   Q.   Can you identify Exhibit 2039 for
23 us?
24   A.   Yes, this is a copy of the expert
25 report as submitted in this matter.

31

1    Q.   Okay. And this has some 48
2 exhibits plus an A and a B exhibit; is that
3 right?
4    A.   Yes, that's correct.
5    Q.   I'm just trying to make sure I've
6 got the complete one.
7    A.   You do.
8    Q.   Now, was there anything else
9 submitted as part of your report other than this
10 document?
11   A.   Not as part of the report. I do
12 think we responded to a subpoena subsequent to
13 turning over the report.
14   Q.   But for purposes of anticipating
15 your testimony, it is covered by this report?
16   A.   Right. In terms of the matter that
17 was before the SEC at that time.
18   Q.   Okay. Now, Mr. Quinn has made
19 reference to some additional documents.
20   A.   Yes.
21   Q.   I am going to have to ask to have
22 these marked as soon as I figure out which way
23 is up.
24        I would like to have marked as Exhibit
25 2040 a collection of documents running from

32

1 Exhibit 1 through Exhibit 11. It's got more
2 pages than 11 because some exhibits have more
3 than one page. Could you mark that as Exhibit
4 2040, please.
5         (Exhibit 2040 for
6 identification, collection of documents from
7 Exhibit 1 through Exhibit 11.)
8 BY MR. WORLAND:
9    Q.   Handing you what has been marked as
10 Exhibit 2040, and asking you if you could
11 identify that for us.
12   A.   Yes, this is some work we did late
13 last week which on Exhibits 1 through 10 takes a
14 slightly different approach to estimating
15 Mr. Koenig's disgorgement amount in that what we
16 do is we try to use maximum use of the findings
17 of Prof. Weil in both the inflation per share
18 and the but for earnings per share on which
19 Mr. Koenig's bonus was based. Other than that,
20 we would use our methodology. In other words,
21 we would offset trading gains with trading
22 losses and we would use a net approach to the --
23 to the bonus. In the course of doing that, we
24 used a more sophisticated test of significance
25 for the excess returns than was used by Prof.

33

1 Weil. And so when we do that one of his excess
2 returns drops out and we applied that same test
3 to -- then to our event study returns and that
4 is what Exhibit 11 is.
5    Q.   Okay. Let me break that down. Is
6 Exhibit 2040 a supplement to your original
7 report?
8    A.   I don't know what technically it
9 would be called. It is just I view it as extra
10 work, additional work that we have done.
11   Q.   Okay.
12   A.   That is relevant to potential
13 testimony of Prof. Weil and to estimating the
14 disgorgement amount for Mr. Koenig.
15   Q.   Okay. Do you intend to testify
16 about that on direct?
17   A.   That really depends on what the
18 attorneys intend to do with it.
19   Q.   What role did you have in preparing
20 Exhibit 2040?
21   A.   It was done under my direction.
22   Q.   And who did it?
23   A.   Primarily Brian Saxton with the
24 help of Kevin Kostka.
25   Q.   And when was it done?

**34**

1  A. Thursday and Friday.
2  Q. And why was it done?
3  A. With the -- with the settlements by
4  the other tests, we could focus on Mr. Koenig's
5  disgorgement. And in that case, there is --
6  there is another way of looking at the
7  disgorgement which becomes -- I don't know if it
8  is easier, but another way to look at it is to
9  take what Prof. Weil has done and make
10 relatively few adjustments that we think conform
11 to what the law on disgorgement is and to good
12 statistical practice but does not get into the
13 issues of whose index is best or who's got the
14 best estimate of earnings per share. So we make
15 relatively minimal adjustments to his analysis
16 and say that even if we were to agree with the
17 event study results, his event study results and
18 his estimates of but for earnings per share, but
19 we disagree on what the law says disgorgement is
20 and we apply one more sophisticated test of
21 significance called it's in the realm of what is
22 called multiple comparisons, then this is the --
23 if we do all that, then this is the result that
24 one would get on the disgorgement amount.
25 Q. Okay. Earlier you mentioned that

**35**

1  you were looking at disgorgement with respect to
2  four different issues. Do you recall that?
3  A. Yes.
4  Q. And it was the bonus, it was the
5  pension, it was Mr. Buntrock's tax situation
6  involving his gift to St. Olaf College and it
7  was the returns on stock trading.
8  A. Right.
9  Q. Now, when you looked at those
10 things, Mr. Buntrock was still in the case,
11 right?
12 A. Yes.
13 Q. Mr. Buntrock is no longer in the
14 case and therefore St. Olaf's College is no
15 longer in the case; is that correct?
16 A. Yes.
17 Q. Does Mr. Koenig have any SERP
18 issues?
19 A. No.
20 Q. For the pension I use SERP because
21 that's the term for the pension. So the
22 disgorgement calculation you make with respect
23 to pensions, that is no longer in the case?
24 A. Correct.
25 Q. Mr. Koenig did have bonuses,

**36**

1  correct?
2  A. Yes, he had bonuses and his bonuses
3  were relatively simple relative to Mr. Rooney's
4  bonuses.
5  Q. Right. And because Mr. Rooney is
6  no longer in the case, we don't have to worry
7  about his bonus.
8  A. Yes.
9  Q. So we have here basically with
10 respect to Mr. Koenig, the issue involving his
11 bonuses and another issue with respect to some
12 stock sales that took place back in 1992?
13 A. No. I would disagree with the
14 latter. I think it's not only the stock sales
15 but also his stock purchases.
16 Q. Well, I think if there were stock
17 purchases and Mr. Weil knew about that, he
18 offset with respect to Mr. Rooney when he knew
19 about it, correct?
20 A. That is not quite his testimony
21 that I read. What he says is that or maybe we
22 are saying the same thing. Let me tell you what
23 I think he says.
24 Q. Forget about what he says for a
25 second. In his report, there is mention that

**37**

1  Mr. Rooney made some stock purchases in the
2  middle of 1996?
3  A. Correct.
4  Q. Do you recall that?
5  A. Yes.
6  Q. And he offset those stock purchases
7  against Mr. Rooney's stock sales?
8  A. Yes.
9  Q. So when he knew about purchases, he
10 offset it at least in the case of Mr. Rooney?
11 A. When he was told by the SEC of
12 those stock purchases.
13 Q. Right.
14 A. I don't think it's clear from his
15 testimony one way or the other whether he knew
16 about the Buntrock and the Koenig stock
17 purchases. He said that this is the way he was
18 asked to do it by the SEC.
19 Q. What was the calculation, do you
20 recall, of what benefit did Mr. Weil apply to
21 Mr. Koenig for stock sales?
22 A. None. Stock sales?
23 Q. Yes.
24 A. The dollar amount?
25 Q. Yes.