# DECLARATION OF ROBERT W. POMMER III

# EXHIBIT 11.

**118**

1   A.   Yes.
2   Q.   And I believe Roman's number is
3   $6,100 or $4,340 depending upon which one of his
4   methods that you use. So we are talking in each
5   case about smallish four figure sums?
6   A.   Yes.
7   Q.   And the rest of your analysis with
8   Mr. Koenig is to include his stock purchases?
9   A.   Right.
10  Q.   And Mr. Weil did not include those
11  and I will stipulate he didn't include those
12  because we didn't tell him about them. Somebody
13  forgot to tell us.
14  A.   Okay.
15  Q.   But looking at -- if you could take
16  a look at Exhibit C to Mr. -- to Prof. Weil's
17  report.
18  A.   Yes.
19  Q.   And you look at the second page of
20  Exhibit C where it has Mr. Koenig's trading at
21  the bottom.
22  A.   Yes.
23  Q.   He has a 28.5 percent price drop
24  method and a $7.98 price drop method.
25  A.   Yes.

**119**

1   Q.   I take it the $7.98 price drop
2   method adjusting for the things we have been
3   talking about this morning is basically the same
4   approach that you used?
5   A.   Basically, yes.
6   Q.   Do you know what the 28.5 price
7   drop method is?
8   A.   He uses -- he uses a percentage
9   price drop instead of a dollar price drop. He
10  gets a bigger number with the percent than with
11  the dollar because the prices of Waste
12  Management is higher back in the earlier days
13  than it is at the time of the price drops where
14  he does his event study.
15  Q.   Okay. Let's take a lunch break.
16       THE VIDEO OPERATOR: We will go off
17  the record. The time is 12:06. This is tape
18  No. 2.
19       (Luncheon recess: 12:06 p.m.)
20
21
22
23
24
25

**120**

1        AFTERNOON SESSION.
2             1:00 p.m.
3        FREDERICK C. DUNBAR,
4   resumed, having been previously duly sworn, was
5   examined and testified further as follows:
6        DIRECT EXAMINATION
7             (Exhibit 2042 for
8   identification, letter dated August 14, 2002
9   from Mr. Dunbar to John Oberdorfer.)
10       THE VIDEO OPERATOR: Okay, we are
11  back on the record. The time is 1:01 and this
12  is tape No. 3.
13  BY MR. WORLAND:
14  Q.   Good afternoon, Mr. Dunbar.
15  A.   Good afternoon.
16  Q.   I'm showing you what I previously
17  showed you just to get a date. It is the letter
18  from you on NERA stationery dated August 14,
19  2002 which was sent to John Oberdorfer and we
20  have now marked this as Exhibit 2042. And you
21  attach a paper by you and Mr. David Tabak?
22  A.   Tabak, yes.
23  Q.   How do you pronounce it?
24  A.   Tabak.
25  Q.   Tabak. Who is Mr. Tabak?

**121**

1   A.   He is a senior vice president at
2   NERA.
3   Q.   This indicates that -- do you work
4   out of White Plains or New York City?
5   A.   I work out of New York City.
6   Q.   And this is a summary of event
7   studies methodology, the April 1999 paper?
8   A.   Yes.
9   Q.   And this was subsequently published
10  somewhere?
11  A.   Yes.
12  Q.   And where was that?
13  A.   In Roman Weil's litigation
14  handbook.
15  Q.   Was it published essentially as it
16  is reproduced here?
17  A.   I think he actually, Professor
18  Weil, had some edits, but they were
19  non-substantive. But other than that, I think
20  it's about the same.
21  Q.   So I can rely on this as a
22  description of how event studies are done?
23  A.   Yes.
24  Q.   Okay. Now I would like to turn to
25  what was previously marked as Exhibit 2040,

## Page 122

1  these papers which Jonathan had this morning.
2  Is Exhibit 1 a summary of what follows?
3      A.   **It is a summary of 1 through 10.**
4      Q.   Okay.
5      A.   **Exhibit 11 is independent.**
6      Q.   Okay, what is Exhibit 11?
7      A.   **Exhibit 11 is our event study. It
8  gives one page per event. It is similar to an
9  exhibit that we have in -- in my report. The
10 difference is on this one, we used what is
11 called the Dunn-Sidak correction for multiple
12 comparisons. That is then described in
13 footnotes 3 and 4, so the footnotes are
14 different than what they are in the study and I
15 think there is one or two places where there is
16 one fewer asterisk on event day, but other than
17 that, it is pretty similar.**
18     Q.   Okay. This is your original event
19 study now being assessed in terms of the
20 Dunn-Sidak, is that how you say it Sidak?
21     A.   **Yes.**
22     Q.   Dunn-Sidak adjusted T statistics?
23     A.   **It is not the T statistic that is
24 adjusted, it is the level of significance that
25 is adjusted.**

## Page 123

1      Q.   Okay.
2      A.   **But yes, with that adjustment.**
3      Q.   So normally, if I look at a T
4  statistic table and I've got percentages of
5  confidence, confidence percentages on one side
6  and the number on the other I found 1.94 at the
7  95 percent level?
8      A.   **Yes.**
9      Q.   And if I looked at a T statistic
10 table adjusted for the Dunn-Sidak analysis at
11 1.94, I would find a lesser level of statistical
12 significance?
13     A.   **Yes, where lesser is higher.**
14     Q.   Smaller?
15     A.   **Instead of 5 percent, it would be
16 15 or 20 percent.**
17     Q.   Okay.
18     A.   **Whatever it would be.**
19     Q.   So basically, the T -- the T
20 statistic is the same, the table from which you
21 would assess statistical confidence is
22 different?
23     A.   **If you were to use the table, yes.**
24     Q.   Right. And so you just verified
25 that your event days remain statistically

## Page 124

1  significant in Exhibit 11?
2      A.   **That's right.**
3      Q.   Now, part of the prior exhibits I
4  guess beginning with Exhibit 2.
5      A.   **Yes.**
6      Q.   Exhibit 2 the T values are the same
7  as Prof. Weil had?
8      A.   **Yes, they should be.**
9      Q.   Right. And the two stars indicates
10 that they are still using the Dunn-Sidak
11 correction, still statistically significant at
12 the 95 percent level?
13     A.   **Correct.**
14     Q.   But the one star indicates that it
15 is statistically significant only at the 90
16 percent level?
17     A.   **10 percent, yes.**
18     Q.   10 percent?
19     A.   **If you are using 5, you go to 10.
20 If you are using 95, you go to 90.**
21     Q.   And when you do the at normal
22 dollar change to get to the $7.14, that
23 basically excludes the 85 cents?
24     A.   **Basically, yes.**
25     Q.   Or 82 on the next pages?

## Page 125

1  And the difference between Exhibit 2 and Exhibit
2  3 is simply the data range that was used in the
3  underlying regression?
4      A.   **For Prof. Weil, yes.**
5      Q.   Yes. So Exhibit 2, 3, 4 and 5
6  basically take the four data range runs that
7  Prof. Weil took for his market model and
8  reassesses the results with respect to an
9  adjusted significance level of the T statistic?
10     A.   **Yes.**
11     Q.   Let me just go ahead and mark as --
12 this may have been previously marked in Romans
13 deposition, but let's do this as 2043.
14              (Exhibit 2043 for
15 identification, document.)
16 BY MR. WORLAND:
17     Q.   I am obviously going to ask you to
18 compare 2043 with your Exhibits 2 through 5.
19          Am I correct that the numbers in your
20 Exhibit 2040, Exhibits 2 through 5, are
21 basically drawn from 2043 or a similar document
22 containing the same results as 2043?
23     A.   **Yes, it looks like there is some
24 independent rounding on the last significant
25 digit for a couple of them, but other than being**

**126**

1  off by the one digit, they seem to be the same.
2  Q. So in your -- in 2040, Exhibits 2
3  through 5, you did some rounding?
4  A. Could be, yes.
5  Q. And so the 2043 is assessed using
6  the regular T stat significance levels without
7  the adjustment and your Exhibit 2040, 2 through
8  5 are adjusted for the Dunn-Sidak correction?
9  A. Yes.
10  Q. Other than that, it is basically
11  the same?
12  A. Yes.
13  Q. Now, when you do the Dunn-Sidak
14  correction, what determines how much correction
15  is necessary?
16  A. The number of comparisons you are
17  going to make. So in the case of Prof. Weil, he
18  does -- he tests four dates and in our case, we
19  test eight dates and the level of significance
20  changes with the number of comparisons that you
21  make because for each additional comparison,
22  there is another chance that you are going to
23  find this one in 20 event which gives you a
24  false signal.
25  Q. Now, the assessment of the event in

**127**

1  the way you did it originally was to look at an
2  individual date and an individual abnormal
3  return and compare that to the market model
4  generated prediction.
5  A. Yes.
6  Q. You weren't assessing any sort of
7  interaction between events?
8  A. Between?
9  Q. Events.
10  A. No. I guess I don't know what you
11  mean. If you are looking at just computing the
12  excess return, you wouldn't look for
13  interactions.
14  Q. Okay. I don't know anything about
15  Dunn and Sidak, so I am asking every question I
16  can think of. But when you and Roman start and
17  you look at October 10, you have a market model
18  that generates a prediction for October 10 based
19  upon your industry index, based upon the S&P 500
20  and based upon the parameters that you have
21  estimated, you compare that one to one with the
22  actual results?
23  A. Yes.
24  Q. And the difference is assessed in
25  terms of a statistical test that comes only from

**128**

1  those two variables? Those two --
2  A. The test of statistical
3  significance depends on your estimate which in
4  this case is the excess return. It depends on
5  your hypothesis which in this case is that the
6  excess return is significantly different from
7  zero, so zero is an important variable. And
8  then it depends on the T statistic which itself
9  is a function of the standard error of the
10  estimate and the degrees of freedom. But given
11  that our samples all have more than 250
12  observations, the degrees of freedom really
13  don't matter.
14  Q. So you are looking for a standard
15  error term generated by the underlying market
16  model?
17  A. Correct. So like if the standard
18  error from the underlying market model is .04 it
19  means that if you observe a 4 percent return on
20  one day, that is a one standard error return.
21  Q. Now, you move on to a subsequent
22  date and you originally just assess it
23  independently the way you did the first one, but
24  there is now in your mind a requirement that you
25  adjust for the fact that you had looked at

**129**

1  October 10 before you looked at October 29.
2  A. Well, okay. Let me try to explain
3  it a little different, because if you do it
4  sequentially like that, you are not really
5  picking up what the hypothesis is. Typically
6  what happens is the analyst says that there is a
7  certain number of days where events occur and I
8  know those days a priori. I do that before I
9  compute any statistical analysis before the
10  market model, before the excess returns, before
11  any of that. And I identify those days by the
12  events that are coming out.
13     I read the news stories. If the
14  news stories are relevant to my analysis or
15  arguably relevant to my analysis, then I include
16  those as event days before I calculate anything.
17  So before I even do anything, I've either got
18  one event, two events, three events, what have
19  you. Knowing that I have got those events I
20  know what my statistical approach is going to
21  be. If I have three events, then I'm going to
22  do a multiple comparison test using three. If I
23  have four events, I'm going to use four. Then I
24  do the market model, the excess returns and the
25  T test or T statistic. After I've done the T

### Page 130

statistic, I find out what its value is and that tells me how many of them are significant at the 5 percent level.

Q. Okay. But clearly you can do an event study without making this Dunn-Sidak correction because when you did yours the first time, you didn't?

A. You can. If you have a T statistic, however, that is close to 2 and you have many events, then at that point you probably should look at -- do a Dunn-Sidak analysis or there is more than one correction you can use. Dunn-Sidak happens to be a fairly convenient one.

Q. Going back to the way I was approaching it which was sequential, at the time you do the first -- I'm trying to figure out why there is a statistical correction -- connection between October 10 and October 29 that would require this adjustment.

A. The rule that you are going to follow is that every time I find a 5 percent level of statistical significance, I am going to call that material and I am going to put that in the damages. So the problem with that rule is

### Page 131

that as you add up the number of comparisons, you increase the chance that you are going to find one of these observations at the 95 percent confidence interval so that you increase the chance that you are actually going to find something that is material.

Q. There has to be, the old coin flip analogy, the fact that it has come up heads nine times in a row does not alter the 50-50 probability when you flip it the tenth time?

A. The coin flip analogy is a good one because it's actually used by Freeman in the Federal Judiciary Center writings on scientific evidence. He did the one on statistics in there. He says that if you flip a coin 10,000 times, there is a very good chance that you are going to come up with a run of ten hits in a row in that 10,000 times, but if you just flip a coin ten times the chances that you are going to get a run of ten is tiny. There is a tiny chance, but as you add the number of coin flips, the chances that you are going to get a run of ten in a row increases even though that is a statistically unlikely event with just ten coin flips. So the same thing with level of

### Page 132

statistical significance. As you increase the number of event days, you increase the chance that you are going to find a 5 percent level of statistical significance.

Q. For an individual day?

A. For any individual day, right. You don't know which day a priori, but you do know you are increasing the chance that you are going to find one.

Q. You may have just answered this, but how many days did you adjust for?

A. Four for Roman and eight for us, but the eight didn't have any backed on our results.

Q. Other than the information that is in Exhibit 2040, since you finished your report in September of 2004 and submitted it, have you done any other work with respect to this case?

A. Well, I read materials in preparation for the deposition.

Q. Okay.

A. But no other analytic chores. I don't think I've done -- I don't believe I've done anything that is analytic.

Q. I think you mentioned that you

### Page 133

looked at Mr. McGraw and Mr. Trenkman's work recently?

A. Right. That was in preparation for the deposition.

Q. Did you look at anything besides your reports, their reports in preparation for this?

A. I looked at the backup materials to my report. So like I may have footnoted some things. I looked at some of those materials. I went over the calculations in the -- in the -- for some of the exhibits and I reviewed news stories and analyst reports from about -- analyst reports from about June through November of '97 and news stories from about then through February of '98, press releases, some of the filings, SEC filings. I don't know all the things I reviewed but that's -- I reviewed the complaint.

Q. About how much time did you spend reviewing things in preparation?

A. I'd say on the order of 30 -- 30, 40 hours.

Q. I take it you spent some time with Jonathan?

**134**

1   A.  We met on Wednesday.
2   Q.  In New York?
3   A.  Yes, we met in New York on
4   Wednesday. We had two other phone calls that
5   were very brief.
6   Q.  About how long did you spend with
7   him on Wednesday?
8   A.  Wednesday he came in at 10 and he
9   left before 2.
10  Q.  And the work on Exhibit 2040 was
11  done on Thursday and Friday?
12  A.  Yes.
13  Q.  Was that done at Jonathan's
14  suggestion?
15  A.  No.
16  Q.  Was it done as a result of
17  something Jonathan said on Wednesday?
18  A.  No.
19  Q.  What triggered it?
20  A.  I wanted it done.
21  Q.  Why? Had you wanted it done before
22  Wednesday?
23  A.  Yes, actually, I did. And I don't
24  take direction very well. I -- the only thing
25  that was in my mind about doing it was whether

**135**

1   would also revise Prof. Weil's regression
2   analysis to take care of what I thought were you
3   know, some of the defects that we talked about
4   earlier and I decided not to do that, just to
5   use -- in order to minimize the number of
6   changes, just to use his regression analysis.
7   Q.  Okay. Let's now move over to the
8   issue of Mr. Koenig's bonus. Now, could you
9   describe the major difference in your mind
10  between -- excuse me, could you describe the
11  major difference in your mind between Roman
12  Weil's approach and your approach as it relates
13  to calculating disgorgement for Mr. Koenig's
14  bonus or bonuses?
15  A.  Yes. When we calculate
16  disgorgement for Mr. Koenig's bonus, we look at
17  earnings per share as restated. His bonus is
18  generally a function of the growth rate in the
19  earnings per share year over year, so when we
20  compute that growth rate as the earnings would
21  have been restated, for example, for 1992 bonus,
22  we look at the restated '91 bonus versus the
23  restated '92 bonus in order to compute his bonus
24  in terms of how it was impacted by the restated
25  earnings or by the alleged fraud.

**136**

1       What Prof. Weil does is he takes
2   the actual 1991 earnings and compares that to
3   the restated '92 earnings because the actual
4   earnings are always higher than the restated
5   earnings. That means his growth rate is always
6   lower. As a result, he comes up with generally
7   zero bonuses in the what we call the but-for
8   world, a situation where there would not have
9   been an alleged fraud, whereas we come up with
10  the fact that fraud has both a cost and a
11  benefit in ongoing years for the incentive
12  bonuses. The fraud has a benefit of increasing
13  the current year's earnings per share, but it
14  has a cost in that it also increased the prior
15  year's earnings per share and it is our reading
16  of the law that you have to net those two out in
17  order to compute the disgorgement amount.
18  Q.  When you say it is our reading of
19  the law, who is the "our" in that?
20  A.  That is me.
21  Q.  What law did you read?
22  A.  I've read just about every
23  disgorgement legal opinion I could get my hands
24  on where the SEC was involved going back to the
25  1970s.

**137**

1   Q.  In your analysis, you basically
2   create -- just forgive me if this is simplified,
3   if you think of a sort of a step function,
4   series of steps for each year, some going down,
5   some going up for the actual reported earnings.
6   And you contrast that with the earnings that
7   would have been reported had the restatement
8   sort of been implemented piecemeal throughout
9   that period?
10  A.  Just implemented, yes. Assuming
11  that the restated earnings are the actual
12  earnings whereas the reported earnings are in
13  some sense fraudulent, then the actual earnings
14  would be those that follow the restatement.
15  Q.  Okay. And so you then look for the
16  growth rate between the restated earnings in one
17  year and the restated earnings in the next year?
18  A.  Yes.
19  Q.  And in fact as I looked at Exhibit
20  2040, the way you do it actually result in the
21  possibility that the bonuses would have been
22  higher had there been no fraud?
23  A.  In particular years, but obviously
24  these things catch up with you and there are
25  other years where the bonus doesn't exist even

138

1  though they had one. The bonuses bounce around
2  but the tendency is with the fraud that there is
3  always going to be some year where the bonus is
4  much smaller. It goes away. The general type
5  of non-cash earnings restatement that we observe
6  here is basically one that for the most part
7  moves earnings around, so some years are better,
8  some years are worse. If the overall amount
9  though is negative, then the overall bonus
10 should be negative as it is here.
11    Q.  Now, in the situation that actually
12 existed at the time Mr. Koenig was involved in
13 reporting the earnings for 1994, is there any
14 way he could have done the but-for analysis you
15 wanted to do without restating for '93?
16        MR. QUINN: Can I hear that
17 question again, please.
18        MR. WORLAND: No, you can't. I'll
19 do it again.
20 BY MR. WORLAND:
21    Q.  Well, let's say it's 1994 and
22 Mr. Koenig is deciding what to put in the 10-K
23 for that year, he could have restated for '92
24 and '93 and then done it for '94 in the way the
25 SEC says he should have done it. That would

139

1  have made his bonus calculated the way you would
2  calculate it in the but-for world; isn't that
3  right?
4     A.  If I understand the question, I
5  think that's right for '94 and for '92.
6     Q.  If he is in '94 originally, you
7  have the original '92 and '93 statements of --
8  financial statements and it comes to the end of
9  1974 and Mr. Koenig has to include financial
10 statements for '94, '93 and '92 in the '94 10-K.
11 If he had restated for '92 and '93 to reflect
12 the restatement that was eventually done and not
13 used the numbers that were used in '94 but used
14 the restated numbers, that would in fact allow
15 him to calculate bonus for '94 to get the same
16 number that you got?
17    A.  Presumably, yes.
18    Q.  But he didn't do that?
19    A.  He did not restate. No, the
20 restatement was done by the audit committee
21 in '98.
22    Q.  Can you think of a reason he didn't
23 do that?
24        MR. QUINN: This will shock and
25 amaze everybody in the room, but I'll object to

140

1  that question.
2        MR. WORLAND: Okay.
3        MR. QUINN: As calling for a
4  laundry list of inadmissible opinions.
5  BY MR. WORLAND:
6     Q.  Let me ask it this way: In your
7  analysis you assume Mr. Koenig could have done
8  that and kept his job?
9        MR. QUINN: I'm going to object to
10 that also. Mr. Worland, when you say "that" we
11 are getting into quicksand, I'm afraid, because
12 the "that" you are now referring to includes a
13 whole bunch of things that you haven't included
14 in your question.
15 BY MR. WORLAND:
16    Q.  When you say he would be entitled
17 to the bonus that you say he would be entitled
18 to in your but-for world, he would have had to
19 restate in '92 and '93 and used the restated
20 numbers for '94, correct?
21    A.  I think I missed the beginning of
22 that. This is for the bonus in '94?
23    Q.  The bonus in '94, to get what you
24 call his but-for bonus in '94 in 1994 through
25 his own decisions, he would have had to restate

141

1  for '92 and '93 and used what we think of as the
2  corrected restated numbers for '94 in the '94
3  10-K?
4     A.  No. I think that the theory is
5  that he and the other folks committed some kind
6  of accounting fraud and the question is what
7  would have happened had they not committed the
8  accounting fraud. It doesn't go into
9  restatement at all. It is just that the
10 earnings would have been different.
11    Q.  Okay.
12    A.  As restated.
13    Q.  I'm not trying to fight over that.
14 If -- I want to make sure that I understand if
15 Mr. Koenig had handled '94 and '93 and '92 as
16 you say as you have it in the but-for world,
17 that would have consisted of him correctly
18 stating '94 and restating '92 and '93 as done by
19 the eventual restatement back in '98?
20    A.  And '91, yes.
21    Q.  And you make the assumption that
22 had he done that, everything else, the bonus
23 formulas, his ability to keep his job, would
24 have been the same?
25        MR. QUINN: I think you may be

**Page 142**

1  talking past each other. I think you've
2  mischaracterized Dr. Dunbar's previous answer.
3  BY MR. WORLAND:
4      Q.    Let me just -- I want you to assume
5  that it is February of 1995. Jim Koenig is the
6  chief financial officer and he is preparing the
7  financial statements for the 1994 10-K which
8  include '92 and '93 as well as '94. Okay?
9  That's the setting. Do you understand?
10     A.    Uh-huh.
11     Q.    In order for him to be in the
12 but-for world that you are using to calculate
13 his but-for bonus for '94, he would have to have
14 restated '92 and '93 to fit the restatement that
15 was done in '98 and to use the '94 numbers from
16 the restatement that was done in 1998; is that
17 correct?
18     A.    I would dispute that from the
19 standpoint of computing disgorgement. I think I
20 would have to disagree with you on that.
21     Q.    Okay, tell me why.
22     A.    The --
23     Q.    Certainly the numbers worked the
24 same?
25     A.    The --

**Page 143**

1      Q.    You can't use the restated '93
2  numbers unless he restates '92. The bonus is
3  calculated by the difference between the
4  restated numbers in '93 and '94. So the setting
5  I've set up for Mr. Koenig in 1994 has the
6  but-for numbers in '92, '93 and '94 that you
7  use, correct?
8      A.    Well, your setting is truth by
9  hypothesis. That is not -- that is not what I
10 am troubled by. What I am troubled by is that
11 that is the scenario that is used to compute a
12 disgorgement remedy. The disgorgement is the
13 remedy where you looked at the net effects of
14 the fraud on the person. I think what your
15 hypothesis is is that there is a fraud for
16 awhile, then he basically confesses up to the
17 fraud and then there is a restatement of the
18 type that is made in 1998. What I am saying is
19 that that is not the way that courts have
20 interpreted the disgorgement remedy. For
21 example, when they say -- the SEC in one case
22 said that this guy that was trading to smooth
23 earnings, not to smooth earnings but to smooth
24 the stock price, they took the 14 days in which
25 he made money on his trades out of a whole bunch

**Page 144**

1  of different dates and the court said no, you
2  can't do that, you have to look at the dates
3  that he lost money versus the days that he made
4  money and you have to net the two. So you are
5  basically saying that he may make money -- he
6  may lose money on a day, makes money on the next
7  day, then loses on the third day, but -- and you
8  would say so that third day he can't -- because
9  if on the first day -- at the end of the first
10 day if he had fessed up to the fraud, there
11 would have been no third day, but that third day
12 according to the courts gets netted against the
13 second day, so that can't be the way the courts
14 interpret disgorgement. Disgorgement is a net
15 effect. You look at both the losses and the
16 gains that resulted -- that actually resulted
17 from the fraud, not a hypothetical situation
18 where there is part fraud and not part fraud and
19 you kind of change the scenario for each
20 individual calculation.
21     Q.    Can you find in here where you did
22 a calculation of Mr. Tobecksen. Did you do one
23 for Mr. Tobecksen?
24     A.    Possibly. I'll take a look.
25 In the summary table there is a bonus

**Page 145**

1  calculation as well as a SERP calculation.
2      Q.    It may not be there because I don't
3  think -- let me ask you a more general question.
4      A.    Yes.
5      Q.    Have you testified in securities
6  fraud cases where there was no restatement?
7      A.    Yes.
8      Q.    Has there been efforts to secure
9  disgorgement in those cases?
10     A.    I can't answer that question. Not
11 that I recall.
12     Q.    How many cases have you testified
13 in in which there was a disgorgement
14 calculation?
15     A.    There may have been cases in which
16 I've testified on the 10(b)5 part and there was
17 disgorgement, a disgorgement request made of
18 executives or others, and I don't really know
19 how many are like that.
20     Q.    Well, have you ever testified
21 before in a SEC case?
22     A.    Yes.
23     Q.    On behalf of defendants?
24     A.    Yes.
25     Q.    Ever on behalf of the SEC?

146

1   A.   No, I was once asked by Larry
2   Harris, but I was conflicted.
3   Q.   Larry Harris our chief economist?
4   A.   **Ex-chief economist, yes, he**
5   **approached us.**
6   Q.   I wonder if Larry knows he doesn't
7   really do that sort of thing.
8   A.   **I assumed he was somebody's agent.**
9   Q.   We were very fortunate to have us
10  come help us out.
11  A.   **I agree with that.**
12  Q.   A bright, able guy. Well, in cases
13  in which you have testified against the SEC, has
14  the case involved disgorgement?
15  A.   **It was under a different name. It**
16  **was an insider trading case. It was loss**
17  **avoided.**
18  Q.   Anything involving accounting fraud
19  against the SEC?
20  A.   **Well, that was an accounting issue.**
21  **No, I'm sorry, I take that back. That was**
22  **material inside information, so I was wrong on**
23  **that. No.**
24  Q.   I'm just trying to get a handle on
25  the theory that you are working with here.

147

1   Let's suppose there was an allegation -- let's
2   suppose the company came out with numbers in
3   1992 and then came out with another set of
4   numbers in 1993 and the SEC alleges that both
5   sets -- subsequently alleges that both sets of
6   numbers were false. Let's suppose the first set
7   of numbers in 1992 were generated by subsidiary
8   X. In other words, the error for the corporate
9   parent was entirely on subsidiary X. Chief
10  financial officer of subsidiary X knew the
11  numbers were in error, the CFO of the company
12  knew the numbers were in error.
13  A.   **I'm sorry, of the subsidiary?**
14  Q.   The CFO of the subsidiary knew the
15  numbers were in error and the CFO of the parent
16  knew the numbers were in error. It comes to
17  1993 and we have a different subsidiary that
18  generates false numbers. The CFO of that
19  subsidiary knows they are false, the CFO of the
20  parent company knows they are false but the
21  subsidiary that presented false financials in
22  1992 presented the correct numbers in 1993, the
23  subsidiary that presented the false numbers in
24  1993 presented correct numbers in 1992. Under
25  those circumstances, we would charge the 1992

148

1   subsidiary CFO with fraud but not for '93 except
2   to the extent there was a republication, but we
3   would charge the subsidiary of 1993 with fraud
4   but not with respect to '92. We would look at
5   any bonus that the 1992 CFO subsidiary received
6   in 1992. We would look at any bonus that the
7   CFO of the 1993 subsidiary got in 1993?
8   Are you with me so far?
9   A.   Yes.
10  Q.   We would look at the bonus of this
11  chief financial officer for the parent with
12  respect to both '92 and '93.
13  A.   Yes.
14  Q.   That would involve for the
15  subsidiary that committed fraud in '92 a
16  comparison of what they did in '92 with what
17  they should have done, correct?
18  A.   Yes.
19  Q.   And in '93, for the subsidiary that
20  committed fraud in '93 a comparison of what they
21  did with what they should have done, right?
22  A.   Yes.
23  Q.   What would be the but-for scenario
24  for the CFO for those two years?
25  A.   **Of the parent?**

149

1   Q.   Yes.
2   A.   **The parent. Well, I'm not sure**
3   **I've come up with a fact pattern that is**
4   **directly on point in the law, but if it is ruled**
5   **that it is a fraud by the CFO and that it is**
6   **part of the CFO's intent to keep his bonus**
7   **intact, then I think he would do it the way I**
8   **did it because it is related. The two are**
9   **related to his bonus in which case you would be**
10  **in a situation where his '92 bonus was probably**
11  **too high, the actual bonus that he got was too**
12  **high but it's not clear what would have happened**
13  **to the '93 -- and it's not clear how much**
14  **the '93 bonus he would have to disgorge. It**
15  **could go either way.**
16  Q.   But if it is done on an earnings
17  per share growth rate as it was done in Waste
18  Management, the likelihood is you wouldn't get
19  full disgorgement. There would be adjusted
20  downward adjustment for '93?
21  A.   **You mean --**
22  Q.   Strike the question. Bad question.
23  Bad question. But the assessment of the bonus
24  for the subsidiary that committed fraud in 1992
25  would be actual versus fraud?

**150**

1  A. Yes.
2  Q. And for the '93 subsidiary, it
3  would be actual versus fraud?
4  A. Yes.
5  Q. So assuming their bonuses were
6  enhanced by their respective roles in each of
7  the frauds --
8  A. Their overall bonus.
9  Q. Right, they would have to give
10 back?
11 A. When you look at '92, '93, '94
12 and '95, yes.
13 Q. They would have to give back a
14 hundred cents on the dollar for '92 and '93?
15 A. Plus the setback.
16 Q. But the CFO might not have to do
17 that because when you calculated his but-for
18 budget in '93 -- but-for bonus in '93 using the
19 but-for numbers in '92, he might actually have
20 gotten the same bonus that he actually received
21 or even a higher bonus?
22 A. No, wait a minute. Then we may
23 have violated one of the assumptions. We are
24 assuming that the overall bonuses of the guys in
25 the subs are higher over this time period,

**151**

1  right? Than they should have been. So it is
2  likely then, unless the CFO used a completely
3  different formula, that his bonus for both of
4  what happened at the subs over this time period
5  would be -- would have been lower but for what
6  happened in both of the subs. My expectation is
7  that when you would calculate these effects that
8  the recalculation of the bonus would result in a
9  much lower bonus for '92 and not such a much
10 lower bonus for '93. But still if the sub who
11 put in the false earnings in '93, if that CFO
12 did worse off overall, then there is still going
13 to be a '93 impact on the CFO for the parent
14 company that is negative, just not as negative
15 as if '92 hadn't been falsified.
16     MR. WORLAND: Let's take a short
17 break.
18     THE VIDEO OPERATOR: Okay, we will
19 go off the record at 1:58. This is tape No. 3.
20     (A recess was taken.)
21     THE VIDEO OPERATOR: Back on the
22 record. 2:08. This is tape three.
23 BY MR. WORLAND:
24 Q. Let's take a look at 2040 which is
25 the exhibit that you just got today and turn to

**152**

1  Exhibit 6. Actually, I don't think I want to
2  talk about Exhibits 6 or 7. I want to turn to
3  Exhibit 8.
4  A. Yes.
5  Q. Now, can you tell me what this is?
6  A. Yes. This is a computation of the
7  expected bonus for 1992 had the earnings been as
8  they were restated. In order for us to do that
9  computation and estimate, in order for us to do
10 that we had to make an estimate of what the 1990
11 earnings per share would have been, so we used
12 the same estimate that we had in my original
13 report which is $1.07.
14 Q. We haven't charged fraud for '91,
15 you know that?
16 A. Correct. But the bonus algorithm
17 requires 1991 earnings in order to compute it.
18 Q. Bonus algorithm for '92?
19 A. For '92. There was the actual
20 restatement restated an amount for pre '92
21 earnings. That was, I forget the full amount,
22 but there was an amount of the restatement that
23 was just pre '92 but it wasn't allocated to
24 various years.
25 Q. I think it was actual the amount of

**153**

1  the restatement attributed to January 1, '92.
2  They restate the opening balance sheet for 1992,
3  I believe is what they did.
4  A. Okay, but it is based on a theory
5  of restating -- it's basically for a change in
6  the earnings. I understand that that would
7  impact the balance sheet, but it is based on a
8  cumulative change in earnings that were the same
9  types of adjustment that were made in '92, '93
10 et cetera, but those types of adjustments extend
11 back past 1992.
12     So in the absence of the alleged
13 fraud, if that same accounting had been done,
14 then the '91 and earlier earnings would have
15 been lower also because it's the same thing.
16 It's just depreciation that was increased and it
17 was increased for '91, '92, '93 and '94 except
18 you just restated or they just restated the '92
19 and '93.
20 Q. So it is your understanding that
21 the -- just as a matter and correct me if I am
22 wrong, Jonathan, just as a matter of accounting
23 as the restatement process works is that you
24 restate the opening balance sheet. There is no
25 1991 financial statement in the 1997 10-K.

**154**

1  There is a 1992 financial statement and I think
2  the way it is done just technically is that you
3  restate the opening balance sheet effective
4  January 1, 1992 and then look at the changes in
5  1992?
6     A.    Or December 31.
7     Q.    Just tell me what you did. Stop
8  the bickering, Jack. Mr. Dunbar, let's go back
9  to what Exhibit 8 stands for.
10    A.    Right.
11    Q.    You have a but-for earnings per
12 share for 1992 and I believe you take that from
13 Prof. Weil?
14    A.    Right. In this instance.
15    Q.    Right.
16    A.    And then we have a but-for earnings
17 per share in 1991 had they been treated the same
18 as post '91 and the result is that there would
19 have been an increase in the earnings per share
20 of 18.7 percent. The target bonus would have
21 been 200 percent but Mr. Buntrock in
22 consultation with the compensation committee
23 argued for a lower bonus for everybody. He
24 actually argued for 100 percent. I think that
25 in our earlier report we came up with an

**155**

1  expected bonus of 87 percent and using that same
2  approach come up with an expected bonus of 103
3  percent.
4     Q.    Okay. Now, you understand the SEC
5  has not charged fraud for before 1992?
6     A.    Well, I'm not sure what that means
7  in terms of disgorgement. The allegation is
8  that there were these earnings manipulations
9  which presumably were found prior to 1992
10 because they are in the work papers. Same
11 earnings manipulations going back before 1992.
12    Q.    So your understanding is that the
13 SEC has charged a fraud that includes periods
14 before 1992?
15    A.    My understanding is that when the
16 restatement was announced, the restatement
17 included earnings prior to -- the restatement
18 basically says that there is a cumulative amount
19 of earnings that were overstated up through
20 1991. We are not telling you which years those
21 applied to, but there is a cumulative amount of
22 earnings that were overstated up through 1991.
23    Q.    Okay. You understand the SEC has
24 not charged a fraud with respect to that?
25    A.    That could be.

**156**

1     Q.    So -- and that what -- so you have
2  in this exercise in Exhibit 8 corrected the
3  earnings for 1991 as part of an effort to
4  calculate the but-for bonus for '92?
5     A.    Right. It's the same conduct that
6  is affecting '91 as affected '92. It's the same
7  conduct on the part of the executives, whatever
8  led to the need for a restatement was there
9  in '91 just as much as it was in '92.
10    Q.    So if the SEC had only charged
11 fraud beginning with 1994 with respect to --
12 let's say Mr. Koenig had not been the chief
13 financial officer of the company in 1993, became
14 the chief financial officer of the company in
15 1994, was unaware of any prior fraud but in
16 order to increase earnings between '93 and '94
17 in fact undertook the activities that we
18 complain of in this complaint. We nonetheless
19 in order to calculate his disgorgement for '94
20 would have to look at the restated numbers
21 for '93.
22    A.    I wouldn't necessarily say that.
23 The set of facts that you are talking about as I
24 understand it are not -- I could be corrected.
25 I would be happy to change things if I am wrong,

**157**

1  but as I understand it, that's not quite the set
2  of facts that we have here.
3     Q.    I know it's not the set of facts
4  that we have here. I'm just trying to
5  understand your logic.
6     A.    So the implication is that I would
7  probably use a different approach.
8     Q.    Let's take the example of
9  Mr. Sanford. Mr. Sanford became CFO just in
10 time to sign the 1996 10-K and in fact did not
11 know what had happened prior to 1996. If he had
12 continued the fraud during 1997 and had been
13 responsible for a fraudulent 1997 10-K in order
14 to calculate his disgorgement for 1997, would we
15 have had to take into account the restatement
16 for 1996 which subsequently happened?
17    A.    Not necessarily.
18    Q.    Why is that?
19    A.    Because the allegation is that his
20 intent is to create a fraud in 1997 that will
21 benefit him and his benefit is the difference
22 between the original '96 and the -- the
23 difference between the '97 restated versus
24 the '97 reported.
25    Q.    So if he didn't have responsibility

Fredrick Dunbar     November 14, 2005
41 (Pages 158 to 161)

**158**

1  for 1996, didn't know about 1996, the starting
2  point are the actual earnings per share for
3  1996?
4      A.    I hate giving an off-the-cuff
5  answer for a hypothetical that I haven't thought
6  through, but I would certainly entertain that as
7  a working hypothesis.
8      MR. QUINN: Probably where the
9  compensation committee in 1997 would have
10 started, don't you think?
11     MR. WORLAND: It's where the
12 compensation committee started every year.
13     MR. QUINN: That's right.
14     MR. WORLAND: I think that was
15 Roman's point.
16 BY MR. WORLAND:
17     Q.    You say you looked at the complaint
18 again.
19     A.    Yes, I did.
20     Q.    And did you see the part of the
21 complaint, just make sure Bob Pommer gets his
22 due. Each of the individual quarters was
23 pleaded separately?
24     A.    Well, each of the individual
25 quarters was addressed in the complaint. There

**159**

1  is a treatment of the -- of the financials that
2  were released for each quarter.
3      MR. QUINN: That is Mr. Pommer's
4  legacy? A separate pleading of quarters? We
5  all have to have goals.
6      MR. WORLAND: Each one is worth a
7  hundred grand. You don't want to leave any out.
8  BY MR. WORLAND:
9      Q.    You make reference to there being
10 an allegation of a continuing scheme. Do you
11 recall that?
12     A.    Right, or a course of conduct, yes.
13     Q.    You understand that you sometimes
14 plead things as an overarching conspiracy plus
15 individual events and violations?
16     A.    I'm not exactly sure.
17     Q.    You charge John Gotti with
18 racketeering and for your predicate acts you
19 identify 19 instances of murder?
20     A.    That I understand.
21     Q.    Okay. Most people do. And you
22 understand they are treated as -- at least
23 potentially treated as separate violations.
24 You've got the racketeering, that's a violation,
25 and then you've got the 19 murders and they can

**160**

1  be addressed separately?
2      A.    Yes. Well, there is obviously
3  penalties associated with each of these. I
4  don't know to what extent this applies to
5  disgorgement.
6      MR. WORLAND: I think I'm good.
7  Mr. Dunbar, pending further events. I guess I
8  should just since this one document I got here
9  today reserve the right to ask more questions,
10 but if we do that it will be some time after we
11 have had a liability determination and it won't
12 take long. Other than that, I have no further
13 questions at this time.
14     MR. QUINN: I have no questions.
15     THE VIDEO OPERATOR: No questions
16 Okay, we will go off the record, it is 2:23.
17 This is the end of tape No. 3.
18     (Time noted: 2:23 p.m.)
19
20
21     _____
22     FREDERICK C. DUNBAR
23 Subscribed and sworn to before me
    this \_\_\_\_\_ day of _____, 2005.
24
25 _____

**161**

1  STATE OF NEW YORK )
                     ss:
2  COUNTY OF NEW YORK )
    I wish to make the following changes, for
3  the following reasons:
4  PAGE LINE \_\_\_\_\_ \_\_\_\_\_
    CHANGE FROM: _____
5      CHANGE TO: _____
    REASON: _____
6
    \_\_\_\_\_ \_\_\_\_\_ CHANGE FROM: _____
7      CHANGE TO: _____
    REASON: _____
8
    \_\_\_\_\_ \_\_\_\_\_ CHANGE FROM: _____
9      CHANGE TO: _____
    REASON: _____
10
    \_\_\_\_\_ \_\_\_\_\_ CHANGE FROM: _____
11     CHANGE TO: _____
    REASON: _____
12
    \_\_\_\_\_ \_\_\_\_\_ CHANGE FROM: _____
13     CHANGE TO: _____
    REASON: _____
14
    \_\_\_\_\_ \_\_\_\_\_ CHANGE FROM: _____
15     CHANGE TO: _____
    REASON: _____
16
    \_\_\_\_\_ \_\_\_\_\_ CHANGE FROM: _____
17     CHANGE TO: _____
    REASON: _____
18
    \_\_\_\_\_ \_\_\_\_\_ CHANGE FROM: _____
19     CHANGE TO: _____
    REASON: _____
20
21     _____
    FREDERICK C. DUNBAR
22
    Subscribed and sworn to before me
23 this \_\_\_\_\_ day of _____, 2005.
24
25 _____
LegaLink Chicago
(312) 263-3524

162

1        CERTIFICATE
2  STATE OF NEW YORK )
3              : ss.
4  COUNTY OF NEW YORK )
5
6        I, HAROLD BROWN, a Certified
7  Shorthand Reporter and Notary Public within and
8  for the State of New York, do hereby certify:
9        That FREDERICK C. DUNBAR, the
10 witness whose deposition is hereinbefore set
11 forth, was duly sworn by me and that such
12 deposition is a true record of the testimony
13 given by the witness.
14       I further certify that I am not
15 related to any of the parties to this action by
16 blood or marriage, and that I am in no way
17 interested in the outcome of this matter.
18       IN WITNESS WHEREOF, I have hereunto
19 set my hand this ____ day of _____, 2005.
20
21
22
23       _____
24       HAROLD BROWN, C.S.R
25

163

1        EXHIBITS
2  DESCRIPTION                          PAGE LINE
3
4  (Exhibit 2039 for identification,      30
5  expert report of Dr. Frederick C.
6  Dunbar in SEC v. Buntrock et al dated
7  September 27, 2004.)
8  (Exhibit 2040 for identification,      32
9  collection of documents from Exhibit
10 1 through Exhibit 11.)
11 (Exhibit 2041 for identification, set  109
12 of handwritten notes.)
13 (Exhibit 2042 for identification,     120
14 letter dated August 14, 2002 from Mr.
15 Dunbar to John Oberdorfer.)
16 (Exhibit 2043 for identification,     125
17 document.)
18
19       EXHIBITS REFERRED TO
20 EXHIBIT     DESCRIPTION              PAGE
21  1472    Prof. Weil's report in
22          this litigation
23  34      Documents containing earnings
24          per share estimates
25