# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) ) ) | |
| ) | No. 02 C 2180 |
| Plaintiff, ) ) | Wayne R. Andersen |
| v. ) ) | District Judge |
| JAMES E. KOENIG, ) ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Before the court is the Securities and Exchange Commission's ("SEC") request for remedies. On March 26, 2002, the SEC filed a civil action against defendant James Koenig ("Koenig") and five other officers of Waste Management, Inc. ("WM") alleging violations of section 17(a) of the Securities Act of 1933, sections 10(b), 13(a) and 13(b) of the Securities Exchange Act of 1934 and Exchange Act rules 10b-5, 13b2-1 and 13b2-2. All of Koenig's co-defendants settled with the SEC. Koenig decided to proceed to a jury trial as to liability on April 18, 2006. The jury returned a verdict finding Koenig liable on all counts on June 29, 2006. The jury found that, as Chief Financial Officer ("CFO") of WM, Koenig committed sixty securities law violations between 1992 and 1996. In denying Koenig's motion for judgment as a matter of law and his motion for a new trial, the court found that there was sufficient evidence in the record to support the jury's verdict and that the verdict was reasonable. Therefore, for purposes of the remedies phase of this case, Koenig's sixty securities law violations are assumed.

On November 14 and 16, 2007, we conducted a bench trial as to remedies. The SEC presented expert testimony from Dr. Roman Weil ("Weil") and Koenig presented expert testimony from Dr. Frederick Dunbar ("Dunbar"). The following constitutes the court's findings

of fact and conclusions of law pursuant to Federal Rule of Civil Procedure ("Rule") 52(a). For the reasons set forth below, the SEC's request for remedies is granted in part and denied in part. Koenig is permanently enjoined from committing violations of the applicable federal securities laws and from holding a position of officer or director in any public company. Koenig is ordered to disgorge $831,500 plus pre-judgment interest at the Internal Revenue Service ("IRS") underpayment rate, 26 U.S.C. § 6621(a)(2). Koenig is ordered to pay a civil penalty equal to the amount of disgorgement plus pre-judgment interest at the IRS underpayment rate. The SEC's request for an indemnity bar is denied. Koenig's oral motion to strike the testimony of Weil is denied. Koenig's motion to reconsider the court's May 24, 2004 order denying the motion to strike the SEC's request for civil penalties as time-barred is denied.

## I. ORAL MOTION TO STRIKE THE TESTIMONY OF DR. WEIL

Before turning to the remedies the SEC is seeking, we first address Koenig's oral motion to strike and his motion to reconsider. At the close of the SEC's case as to remedies, Koenig orally moved to strike the testimony of Weil, the SEC's remedies expert, pursuant to Rule 26(a)(2) and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny. Koenig, moved to strike the testimony on two grounds. First, he argued that Weil testified as to previously undisclosed opinions in violation of Rule 26(a). Second, he argued that Weil's testimony consisted of unscientific and speculative guesswork. Both grounds lack merit. Therefore, the motion is denied.

Koenig sought to strike Weil's testimony regarding "shareholder loss." Shareholder loss in the context of this case is the dollar figure loss in market value of WM stock associated with Koenig's securities law violations. During the bench trial, Weil testified that shareholder loss

attributable to Koenig's violations was approximately $3.59 billion. Koenig's expert, Dunbar, testified that the loss was $1.45 billion. Koenig moved to strike Weil's testimony regarding the $3.59 billion shareholder loss because that figure was not in Weil's expert report. The SEC concedes that the $3.59 billion figure is not in the report. However, Weil's expert report does contain his calculation of the individual loss per share of WM stock attributable to Koenig's violations, which was $7.98 per share. To reach the $3.59 billion figure, Weil merely multiplied the $7.98 per share figure by the number of outstanding shares of WM stock.

Weil's expert analysis came in calculating the $7.98 per share figure, which was disclosed, and not in multiplying that figure by the number of outstanding shares. Therefore, the court will not strike Weil's testimony regarding shareholder loss attributable to Koenig's violations pursuant to Rule 26(a). The court also notes that the shareholder loss calculations by both experts are well in excess of $1 billion. As will be discussed in more detail below, for purposes of analyzing shareholder harm as it relates to a determination of remedies, Dunbar's conservative calculation of shareholder loss is more than sufficient to establish substantial harm. Accordingly, out of an abundance of caution, the court will rely on Dunbar's $1.45 billion calculation even though Weil's figure is admissible and credible.

Koenig also sought to strike the entirety of Weil's testimony as unscientific and speculative. Koenig argues that Weil admitted that he "guessed" when calculating the $1.60 adjusted earning per share ("EPS") figure for 1991, which Weil relied on for his disgorgement calculation. Koenig mischaracterizes Weil's testimony. Weil did not testify that he guessed with respect to the $1.60 EPS figure for 1991. Weil used the $1.60 figure because that is the figure that the WM Compensation Committee used to calculate 1992 bonuses for Koenig and other

3

WM executives. Weil testified that he could not state with any certainty how the Compensation Committee determined the 1992 bonuses for Koenig and other WM executives and any testimony he could give regarding that topic would be a guess. This statement is not grounds for striking Weil's testimony.

Finally, Koenig sought to strike Weil's testimony claiming that his disgorgement calculations were based on the incorrect assumption that the jury found that Koenig made a series of incremental choices to commit fraud between 1992 and 1996. The court disagrees and finds that the assumptions Weil made in his expert report and during his testimony at the hearing are consistent with the jury's findings. Therefore, the motion to strike is denied.

## II. <u>MOTION TO RECONSIDER</u>

In Koenig's written opposition to the SEC's request for remedies, he moves the court to reconsider the portion of our May 24, 2004 order wherein we found that the SEC's claims for civil remedies were not time-barred. In that order, we found that the SEC's claims for civil penalties were timely based, in part, on the "discovery of violation" rule that the Seventh Circuit adopted in *Law v. Medco Research, Inc.*, 113 F.3d 781 (7th Cir. 1997). We noted that *Law* involved Rule 10b-5 claims, but found that the Seventh Circuit's general adoption of the "discovery of violation" rule should be extended to civil penalties in securities fraud cases that are governed by the five-year statute of limitations in 28 U.S.C. § 2462. Koenig moves to reconsider that finding, arguing that it was wrong as a matter of law.

In support of his motion, Koenig relies on *SEC v. Jones*, No. 05-7044, 2006 WL 1084276 (S.D.N.Y. Apr. 25, 2006). In *Jones*, the court found that the "discovery of violation" rule does not apply to securities fraud cases governed by the five-year statute of limitations in Section

4

2462. However, the court in *Jones* found that the "fraudulent concealment doctrine" could toll the five-year statute of limitations for civil penalties in a securities fraud case. *Jones*, 2006 WL 1084276 at *6.

We still find that the Seventh Circuit's general adoption of the "discovery of violation" rule in securities fraud cases should extend to civil penalties in cases governed by the five-year statute of limitations in Section 2462. However, we also find that, alternatively, the SEC's civil penalty claims would have been timely under the "fraudulent concealment doctrine" as outlined in *Jones*. Therefore, the motion to reconsider is denied.

### III. REMEDIES

Having dealt with Koenig's preliminary motions, we now address the SEC's request for remedies. The SEC is seeking: (1) a permanent injunction that enjoins Koenig from committing future violations of applicable securities laws; (2) a permanent officer and director ("O&D") bar that prohibits Koenig from holding a position as an officer or director of a publically traded company; (3) disgorgement of $831,500 plus pre-judgment interest at the IRS underpayment rate; (4) civil penalties totaling $3 million; and (5) an indemnity bar prohibiting Koenig from seeking or accepting any payment, reimbursement, or indemnification from any third party for any part of his disgorgement, pre-judgment interest, or penalties.

Koenig seeks a finding that the SEC is not entitled to any remedies. Alternatively, to the extent the court is inclined to award remedies, Koenig argues that disgorgement should not exceed $90,722 plus pre-judgment interest at the rate provided by 28 U.S.C. § 1961. If the court awards civil penalties, Koenig urges that a "per violation" approach would not be appropriate and the penalties should not exceed the amount of disgorgement. Finally, Koenig argues that the

5

court does not have the authority to impose an indemnity bar and that any injunctive relief should be narrowly tailored in time and scope.

## A. FINDINGS OF FACT AS TO REMEDIES

The following facts are taken from the hearing testimony and exhibits introduced into evidence during the bench trial on remedies.

### 1. FACTS AS TO INJUNCTIVE RELIEF

Koenig was the CFO of WM for all years relevant to this case (1992-1996). A jury found that over that five-year period, Koenig committed sixty securities law violations, which according to Dunbar's conservative estimate, resulted in a $1.45 billion loss to WM shareholders. Koenig's violations resulted in one of the largest shareholder losses in U.S. history and caused substantial harm to WM shareholders. Further, Koenig was a key and knowing participant in the fraud. As WM's CFO, Koenig signed WM's false representation letters to the SEC for the years 1992 through 1996. He also signed the Summary of Action Steps ("Action Steps") created by an Arthur Andersen audit team in early 1994, which described virtually every accounting violation in this case and what needed to be done immediately to correct them. Koenig did not take any steps to correct the accounting violations and, instead, knowingly continued them.

Koenig also had a substantial economic stake in the fraud. Between 1992 and 1996, he received $3,157,000 in salary, an additional $1,186,000 in bonuses and $1,485,000 in restricted stock from WM. Receipt of that compensation was contingent upon Koenig maintaining his job as CFO of WM. Koenig's bonuses and, to a lesser degree, salary were contingent upon WM posting consistent EPS increases over that five-year period. Accordingly, because his compensation was based, in part, on the financial success of WM, the court finds that Koenig had

a substantial economic stake in the fraud.

The court also finds that Koenig's violations were recurrent in nature. The violations encompassed a five-year period in which Koenig repeatedly filed false representation letters with the SEC. Although this is the first time the government has charged Koenig with securities law violations, the duration of the violations in this case is sufficient to establish their recurrent nature. Finally, the court finds that Koenig's assurances that he will not commit future violations are not sincere. Indeed, he continues to insist that he committed no violations. Throughout this case, Koenig maintained his innocence, which is his right. However, the jury found that he committed each of the sixty charged violations and we found the verdict to be reasonable.

*2. FACTS AS TO DISGORGEMENT*

The SEC seeks to disgorge the bonuses Koenig received from WM for the years 1992 through 1995. It is undisputed that those bonuses were tied to the profitability of WM as reflected by EPS and that Koenig's violations artificially inflated WM's EPS. The EPS inflation resulted in higher bonuses for Koenig. For purposes of disgorgement, the court must determine what portion of the bonuses for 1992 through 1995 were the result of EPS inflation and what bonuses, if any, Koenig would have received absent the securities violations. The court finds that, absent the violations, Koenig would not have received any bonuses for the years 1992 through 1995 and, thus, the SEC's $831,500 disgorgement figure is an appropriate estimation of Koenig's ill-gotten gains.

The parties agree that Koenig received a $161,500 bonus for 1992, no bonus for 1993, a $250,000 bonus for 1994 and a $420,000 bonus for 1995, totaling $831,500 in bonuses between 1992 and 1995. The parties' experts presented their "but for" analyses in an attempt to determine

7

what bonuses, if any, Koenig would have received for the years 1992 through 1995 absent the violations. Both experts agree that, absent the violations, Koenig would not have received any bonus money in 1993 or 1995, resulting in $420,000 in disgorgement for those years. The experts disagree about how to treat the bonus money for 1992 and 1994. Under Weil's "but for" analysis, Koenig should not have received any bonuses in 1992 and 1994. Under Dunbar's "but for" analysis, Koenig would have received a $140,505 bonus in 1992 and a $500,000 bonus in 1994.

Although both experts are highly qualified and provided competent analyses, the court is more persuaded by Weil's analysis and finds that it better reflects the ill-gotten gains Koenig received as a result of his violations. The court is not persuaded by Dunbar's calculation of the 1992 "but for" bonus. In reaching his $140,505 figure, Dunbar adjusted WM's 1991 EPS figure. 1991 is outside the relevant time frame and the court is not persuaded by Dunbar's rationale for adjusting the 1991 EPS figure. Further, Dunbar conceded that, if he had not adjusted the 1991 EPS figure under his "but for" analysis, he would have reached the same conclusion Weil reached – that Koenig would not have been entitled to any bonus money for 1992.

As for 1994, the court is not persuaded by Dunbar's testimony that, absent Koenig's violations, his bonus for 1994 would have doubled. 1993 was a down year for WM and, despite Koenig's violations, WM reported an almost 18 percent decrease in EPS. Under Dunbar's analysis, absent the violations, WP would have reported a 28 percent decrease in EPS. In light of such poor performance in 1993, the court is not persuaded that, absent the violations, Koenig would have retained his job in 1994, much less have received a $500,000 bonus. The court finds that Weil's "but for" calculation of the 1994 bonus – zero, or no bonus – is based on more sound

8

analysis than Dunbar's calculation. Accordingly, the court finds that $831,500 is an appropriate estimation of Koenig's ill-gotten gains and is the amount Koenig should disgorge.

B. CONCLUSIONS OF LAW

The SEC bears the burden of establishing it is entitled to the requested remedies by a preponderance of the evidence. *Steadman v. SEC*, 450 U.S. 91, 103 (1981). The SEC can rely on direct or circumstantial evidence to meet its burden. *SEC v. Ginsburg*, 362 F.3d 1292, 1297 (11th Cir. 2004).

*1. PERMANENT INJUNCTION AND O&D BAR*

The SEC has established, by a preponderance of the evidence, that Koenig should be permanently enjoined from committing future violations of applicable securities laws and from holding any position as an officer or director of a publicly traded company. After considering the totality of the circumstances surrounding Koenig's securities violations, the court finds that there is a reasonable likelihood of future violations sufficient to warrant a permanent injunction and an O&D bar. *See SEC v. Holschuh*, 694 F.2d 130, 144 (7th Cir. 1982); *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995). As discussed above, in reaching this conclusion the court considered, *inter alia*, the gravity of the harm caused by Koenig's violations; the extent of Koenig's participation in the violations and the degree of scienter; the recurrent nature of the violations and the likelihood that Koenig's customary business activities might again involve him in such transactions; and Koenig's failure to recognize his own culpability and the sincerity of his assurances against future violations. *Id*.

In light of the overwhelming evidence that Koenig committed the charged violations and his refusal to acknowledge his culpability, the court finds that there is a reasonable likelihood of

9

future violations despite the fact that Koenig does not presently work in finance for a publicly traded company. *See SEC v. Lipton*, 278 F.3d 656, 664 (7th Cir. 2002). We find that a permanent injunction and permanent O&D bar are necessary and will deter Koenig and other corporate officers. The accuracy and legitimacy of financial reports released by public companies are crucial to the proper functioning of both the American and world economies. Corporate officers must report honest figures. In the future, if he believes his circumstances have significantly changed, Koenig may petition the court to modify the terms of the O&D bar.

*2. DISGORGMENT*

The SEC has also established by a preponderance of the evidence that it is entitled to disgorgement. Disgorgement is an equitable, not a punitive remedy and should be fashioned so as to deprive Koenig of the unjust enrichment he derived from his securities violations. *Lipton*, 278 F.3d at 664. The disgorgement figure calculation is discretionary and need not be exact. *SEC v. First Jersey Sec. Corp.*, 101 F.3d 1450, 1474-75 (2d. Cir. 1996). Ambiguity relating to the calculation should be resolved against Koenig. *SEC v. Lorin*, 76 F.3d 458, 462 (2d Cir. 1996). As discussed above, we find that Weil's $831,500 disgorgement figure adequately deprives Koenig of his ill-gotten gains and is not punitive.

We also decline to adjust the disgorgement figure to reflect taxes Koenig may have paid on his bonus money or to account for stock losses he may have incurred. Koenig has not cited to a single case involving an SEC enforcement action in which the court adjusted the disgorgement figure to account for income taxes the violator may have paid on his ill-gotten gains. As we stated above, the disgorgement figure is discretionary and need not be exact. *First Jersey Sec. Corp.*, 101 F.3d at 1474-75. Therefore, we decline to adjust the disgorgment figure to account

for income taxes and find that the $831,500 figure is not punitive and is a reasonable approximation of Koenig's ill-gotten gains.  The tax consequences for Koenig as a result of his ill-gotten gains and subsequent disgorgement are far from certain and his arguments about the punitive nature of not taking income taxes into account is exaggerated.  Notably, Koenig did not provide the court with a copy of his 1992 tax return and he may be able to obtain future tax deductions for taxes he previously paid on the ill-gotten gains if he pays the ordered disgorgement.  *See* 26 U.S.C.A. § 1341.  We leave the tax consequences of this decision for Koenig to work out with the IRS.

The court finds Koenig's argument regarding his stock "losses" almost insulting.  Koenig seeks to offset the disgorgement figure by $22,000 to account for his stock "losses."  He maintains that, due to his own false SEC filings, he purchased stock at a price that was inflated by $22,000.  Koenig claims that any disgorgment figure should be reduced by $22,000 to account for that price inflation.  In support of his request, Koenig cites to *SEC v. McCaskey*, 2002 WL 850001, at *5 (S.D.N.Y. Mar. 26, 2002).  That case involved Section 10(b) and Rule 10b-5 securities violations.  *Id.*, at *1.  There the SEC sought civil remedies similar to the remedies it is seeking in the instant case.  *Id*.  The court in *McCaskey* denied the defendant's request to offset the disgorgement figure, reasoning that "[t]he disgorgement amount should not be offset by any losses incurred by the wrongdoer when the scheme collapsed. . . .  A manipulator is not relieved of its disgorgement obligations simply because it chooses, for whatever reason, to retain manipulated securities until their subsequent drop in price dissipates some or all of the manipulator's ill-gotten gains." *Id.*, at *5.  We find the reasoning in *McCaskey* persuasive and applicable to the facts in this case.  Accordingly, we will not offset the disgorgement figure to

11

account for Koenig's alleged stock losses.

Finally, in our discretion, we find that Koenig should pay pre-judgment interest on the disgorgement figure at the IRS underpayment rate. *See* 26 U.S.C. § 6621(a)(2). Koenig concedes that the majority of courts apply the IRS underpayment rate to SEC disgorgements and that this court has done so in the past. *See SEC v. Randy*, 38 F. Supp. 2d 657, 674 (N.D. Ill. 1999)(Andersen, J.); *SEC v. Jakubowski*, No. No. 94-4539, 1997 WL 598108, at *2 (N.D. Ill. Sept. 19, 1997). The IRS underpayment rate is an appropriate pre-judgment interest rate and we find no reason to deviate from that rate in this case. We also note that Koenig has been in possession of the ill-gotten gains from his securities law violations for more than a decade. Koenig was the CFO of a publicly traded company. He is a sophisticated investor with extensive financial savvy. The returns Koenig has generated on those ill-gotten gains over the past decade, if he invested them, likely far exceed the IRS underpayment rate or any other available pre-judgement interest rate.

### 3. CIVIL PENALTIES

Section 21(d)(3) of the Exchange Act and Section 20(d) of the Securities Act authorize the imposition of civil money penalties for violations of federal securities laws. 15 U.S.C. § 78u(d)(3)(A); 15 U.S.C. § 77t(d)(1). Those provisions authorize three tiers of penalties depending on the culpability and severity of the defendant's conduct. 15 U.S.C. § 78u(d)(3)(A); 15 U.S.C. § 77t(d)(1). Courts have adopted two general methods for assessing civil penalties in securities cases, a "per violation" approach and a "proportional" approach. The SEC advocates application of the former, while Koenig supports application of the latter, if the court finds that the imposition of a civil penalty is warranted.

As an initial matter, we find that a civil penalty is warranted in this case. Disgorgement and injunctive relief are not sufficient to deter Koenig and others from committing future securities violations. There must be punitive repercussions for Koenig's violations, which caused at least $1.45 billion in losses to WM shareholders. To hold otherwise would impermissibly increase the incentive to violate the securities laws. Without civil penalties, the only financial risk to violators is forfeiture of their ill-gotten gains.

The SEC requests a $3 million civil penalty. Under the "per violation" approach, the SEC seeks thirty third-tier penalties for Koenig's Section 10(b), 17(a)(1), 13(a), 13b2-1, and 13b2-2 violations. The jury found that Koenig committed five violations of each of the following sections: 10(b), 17(a)(1), 13(a) and 13b2-2. The jury further found that he committed ten violations of Section 13b2-1. Koenig requests that the court not impose a civil penalty in excess of his ill-gotten gains. After full consideration of the competing considerations, we find that a civil penalty in the amount of the disgorgement figure ($831,500 plus pre-judgment interest) is appropriate and serves as an ample punishment for Koenig and a deterrent to like-minded individuals.

*4. INDEMNITY BAR*

The SEC's request for an indemnity bar is denied. The SEC failed to cite to any case law authority to support its request. Koenig's indemnity rights are not properly before this court. We do not and cannot take a position on the validity or enforceability of one or more indemnity agreements between Koenig and non-parties.

## IV. **CONCLUSION**

Based on the foregoing findings of fact and conclusions of law, it is ordered that:

1. The SEC is ordered to submit a proposed injunctive order that states the specific securities statutes Koenig may not violate.

2. Koenig is permanently barred from holding a position as an officer or director of a publicly traded company. Koenig may petition the court to modify this remedy on a future date if he can show good cause why the permanent officer and director bar should be lifted.

3. Koenig is ordered to pay disgorgement of $831,500 plus pre-judgment interest at the IRS underpayment rate, 26 U.S.C. § 6621(a)(2). Pre-judgment interest should be calculated from the date Koenig received each of the bonuses for 1992, 1994 and 1995. The SEC is ordered to calculate the applicable pre-judgment interest and submit that figure, in the form of a judgment order, to the court by December 14, 2007.

4. Koenig is ordered to pay a civil penalty, to be set forth in the judgment order, equal to the amount of total disgorgement, $831,500 plus pre-judgment interest at the IRS underpayment rate.

5. The SEC's request for an indemnity bar is denied.

6. The SEC is ordered to submit a proposed distribution plan for the money paid by Koenig in disgorgment and civil penalties by December 14, 2007.

_____
Wayne R. Andersen
District Judge

Dated: December 3, 2007